STATE of Wisconsin, Plaintiff-Respondent,

v.

Calvin BOGGESS, Defendant-Appellant-Petitioner.

Supreme Court

*No. 82–798–CR. Argued October 5, 1983.—*
*Decided November 30, 1983.*

(Also reported in 340 N.W.2d 516.)

For the petitioner there were briefs and oral argument by *Donna L. Hintze,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with *Bronson C. La Follette,* attorney general.

WILLIAM A. BABLITCH, J. Calvin Boggess petitions for review of a published decision of the court of appeals[1] affirming a judgment of conviction for three counts of child abuse, contrary to sec. 940.201, Stats.[2]

---

[1] *State v. Boggess,* 110 Wis. 2d 309, 328 N.W.2d 878 (Ct. App. 1982).

[2] Section 940.201, Stats., provides:

"**940.201 Abuse of children.** Whoever tortures a child or subjects a child to cruel maltreatment, including, but not limited, to severe bruising, lacerations, fractured bones, burns, internal in-

Boggess contends that a social worker's and police officer's warrantless entry into his home for the purpose of determining the safety and welfare of two children constituted an unreasonable search and seizure, contrary to the fourth amendment to the United States Constitution[3] and article I, sec. 11 of the Wisconsin Constitution.[4] He asserts that all evidence obtained as a result of that entry must be suppressed.

We hold that under the totality of circumstances in this case, a reasonable person would have believed that there was an immediate need to render aid or assistance to the children due to actual or threatened physical injury, and that there was an immediate need for entry into the home to provide aid or assistance to them. Therefore, the warrantless entry was justified under the emergency rule exception to the warrant requirement. We affirm the decision of the court of appeals.

juries or any injury constituting great bodily harm under s. 939.22(14), is guilty of a Class E felony. In this section, 'child' means a person under 16 years of age."

[3] The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

The provisions of the fourth amendment are applicable to the states through the Due Process Clause of the fourteenth amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

[4] Article I, sec. 11, of the Wisconsin Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

On Friday, February 6, 1981, Greg Benesh, a social worker with the Oconto County Department of Social Services, received an anonymous telephone call around suppertime. The caller indicated that children may have been battered and were in need of medical attention. The caller identified two children by their last names (and at least one, if not both of the children, by the first name), and indicated that they lived with Boggess, the defendant. Through this information, the caller indicated that the children had different last names than Boggess. The caller also indicated that one of the children, L.S.[5], was limping, and that because of bruises the caller witnessed on L.S., L.S. may have further damage done to his body and should be checked by a doctor. The caller additionally stated that he knew the Boggesses fairly well and that Mr. Boggess had a bad temper.

Immediately after the call ended, Benesh telephoned Joan Hammel, another social worker employed by the Oconto County Department of Social Services who was the intake worker on duty that evening. Benesh relayed to her the information that the anonymous caller had provided. Shortly thereafter, Hammel met with Officer Douglas McMahon, traffic sergeant for Oconto county. Hammel explained to McMahon that she was going to the town of Underhill to the Calvin Boggess residence because the health, safety and welfare of two children were in question. She asked McMahon to accompany her for her protection because of the caller's statement that Boggess had a bad temper.

When Hammel and McMahon arrived at the Boggess residence, they went to the door and Hammel knocked. When Calvin Boggess opened the door, Hammel identified herself and McMahon, and stated that she was an agent

---

[5] The caller provided the full first and last names of at least one, if not both, of the children. For purposes of this decision, only the initials of the children's names will be used.

of the social services department and that McMahon was a member of the Oconto County Traffic Department. Hammel informed Boggess that the reason they were there was to ascertain the safety and welfare of the two children because her agency had received a telephone call concerning the children's safety. At that point, Boggess asked Hammel if she had a warrant, to which Hammell responded that she did not need one because ". . . by the Children's Code a warrant is not necessary for minor children."[6] Hammel and McMahon then entered the home.

Once inside the home, Hammel went over to L.S. and saw that a pronounced part of his lip was missing and that the wound was inflamed and needed to be cleaned. Without directing the question to anyone in particular, Hammel asked, "What happened? How did he get hurt?" Calvin Boggess responded that he had fallen on L.S. and had hurt him. Later, Boggess stated, without prompting, that he had spanked both children several times.

With Janice Boggess present, Hammel examined L.S. more thoroughly in a rear bedroom. She observed that he had bruises on both sides of his legs from the ankles to the thighs, and that his arms were black and blue from the elbows to the wrists and halfway up his back. She also noticed that L.S. had hair missing from the top of his head, and that he walked with a "waddled limp." Hammel then examined K.S. and observed bruises on her body.

After Hammel finished examining K.S., Hammel and McMahon immediately took both children in McMahon's squad car to the nearest hospital. At the hospital, the children received medical examinations and photographs of both children were taken.

---

[6] The Children's Code is codified in ch. 48, Stats.

Boggess was charged with two counts of child abuse, contrary to sec. 940.201, Stats., and one count of mayhem, contrary to sec. 940.21.[7] Boggess filed motions to suppress his statements made after Hammel and McMahon entered his residence, Hammel's and McMahon's observations of L.S. and K.S. made inside the Boggess home, and the photographs of the two children taken at the hospital. As grounds for these motions, Boggess contended that this evidence was the product of an illegal search.

The trial court denied the motions. The state then filed an amended information against Boggess, charging him with three counts of child abuse, contrary to sec. 940.201, Stats. Boggess pled guilty to the amended charges and was convicted. Boggess subsequently appealed to the court of appeals, which affirmed the trial court.

We note at the outset that the Children's Code, ch. 48, Stats., does not expressly authorize a warrantless entry into a home. Even if such authority could be inferred from the provisions of ch. 48, those provisions cannot and do not supersede the provisions in the United States and Wisconsin Constitutions prohibiting unreasonable searches and seizures.

Both the fourth amendment to the United States Constitution and article I, sec. 11 of the Wisconsin Constitution proscribe unreasonable searches and seizures.[8] The basic purpose of this prohibition is to safeguard the

---

[7] Section 940.21, Stats., provides:

"Mayhem. Whoever, with intent to disable or disfigure another, cuts or mutilates the tongue, eye, ear, nose, lip, limb or other bodily member of another, is guilty of a Class B felony."

[8] Because article I, sec. 11 of the Wisconsin Constitution is substantially similar to the fourth amendment to the United States Constitution, we have recognized that the standards and principles surrounding the fourth amendment are generally applicable to the construction of article I, sec. 11. *See State v. Paszek,* 50 Wis. 2d 619, 624, 184 N.W.2d 836 (1971).

privacy and security of individuals against arbitrary invasions by government officials. *See Michigan v. Tyler,* 436 U.S. 499, 504 (1978). The United States Supreme Court has consistently held that warrantless searches are per se unreasonable under the fourth amendment, subject to a few carefully delineated exceptions. *Cady v. Dombrowski,* 413 U.S. 433, 439 (1973). These exceptions have been "jealously and carefully drawn", *Jones v. United States,* 357 U.S. 493, 499 (1958), and the burden rests with those seeking exemption from the warrant requirement to prove that the exigencies made that course imperative. *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971).

In this case, Hammel's and McMahon's entry into the Boggess residence was a search within the meaning of the fourth amendment to the United States Constitution and article I, sec. 11 of the Wisconsin Constitution.[9] A warrant was therefore required for this intrusion unless it was justified under an exception to the warrant requirement. If the circumstances presented no exception to the warrant requirement, all evidence obtained as a result of the entry and search must be suppressed.

The state asserts, and the trial court and court of appeals agreed, that the warrantless entry in this case

---

[9] The fourth amendment to the United States Constitution is applicable to situations involving intrusions upon privacy interests by government officials. It is therefore a limitation upon the government only. *See Burdeau v. McDowell,* 256 U.S. 465 (1921); 1 LaFave, *Search And Seizure,* sec. 1.6 at 110 (1978). Although a social worker initiated the intrusion in this case, the fourth amendment is still implicated. As previously noted, county agencies are statutorily authorized to investigate reports of child abuse. *See* sec. 48.981(3)(c)1., Stats. Hammel was therefore acting as a government official when she went to the Boggess residence. We also note that a traffic sergeant, who is a government official, accompanied Hammel to the Boggess residence and entered the home with her.

was lawful because it was justified under the emergency rule exception to the warrant requirement. In *State v. Pires,* 55 Wis. 2d 597, 201 N.W.2d 153 (1972), we approved an emergency rule as an exception to the warrant requirement. We recognized that neither the fourth amendment to the United States Constitution nor the Wisconsin Constitution bars a governmental official from making a warrantless intrusion into a home when the official reasonably believes that a person within is in need of immediate aid or assistance.[10] The rule demands that the government official's actions be motivated solely by a perceived need to render immediate aid or assistance, not by a need or desire to obtain evidence for a possible prosecution. 55 Wis. 2d at 604. This exception to the warrant requirement is grounded on the notion that the preservation of human life is paramount to the right of privacy protected by the fourth amendment. *State v. Prober,* 98 Wis. 2d 345, 363–64, 297 N.W.2d 1 (1980).

In *Prober,* we established a two-step analysis for determining the validity of a warrantless search under the emergency rule:

"First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, . . . until it can be

---

[10] In our discussion of the emergency rule in *State v. Prober,* 98 Wis. 2d 345, 297 N.W.2d 1 (1980), we cited the following statement by the New York Court of Appeals in *People v. Mitchell,* 347 N.E.2d 607, 610 (N.Y. 1976): ". . . the protection of human life or property in imminent danger must be the motivation for the search rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding." Because this case does not involve a warrantless entry into a home for the protection of property, we need not decide whether such an entry could be justified as within the emergency rule exception to the warrant requirement.

found that a reasonable person under the circumstances would have thought an emergency existed, the search is invalid." 98 Wis. 2d at 365.

The first test is a subjective test, and the second is an objective test. Both tests must be satisfied before a warrantless entry will be justified under the emergency rule exception.

For purposes of this review, Boggess does not challenge the trial court's finding that Hammel and McMahon were motivated by a perceived need to render aid or assistance. The first or subjective test of the *Prober* analysis is therefore satisfied.

Boggess instead argues that the second or objective test of the *Prober* two-step analysis is not satisfied. He contends that under the totality of circumstances confronting Hammel and McMahon at the time they entered the Boggess residence, a reasonable person would not have believed that an emergency existed. We disagree.
[2]
The objective test of the emergency rule requires that the officer be able to point to specific facts that, taken with the rational inferences from those facts, reasonably warranted the intrusion into an area in which a person has a reasonable expectation of privacy. The requirement of reasonable grounds to believe that an emergency existed must, however, ". . . be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *State v. Kraimer,* 99 Wis. 2d 306, 324, 298 N.W.2d 568 (1980), quoting 2 LaFave, *Search and Seizure,* sec. 6.6(a) (1970). *See* 2 LaFave, *Search and Seizure,* sec. 6.6 at 468 (1978).

Our prior cases upholding a warrantless entry into a home under the emergency rule exception have generally involved a set of common circumstances from which we

concluded that a reasonable person could have believed an emergency existed. For example, in *Kraimer,* police made a warrantless entry into a home after receiving three anonymous telephone calls. The caller stated, in part, that he had shot and that he believed he had killed his wife four days earlier, that his four children were at home with him, and that he was very upset. We concluded that under the objective test of the *Prober* analysis, a reasonable person could have believed that an emergency existed. Similarly, in *Pires,* police made a warrantless entry into a home after receiving a police radio dispatch to go to the defendant's address because of a report that there supposedly was a child's body and a semiconscious woman in the dwelling. We held that their initial entry into the dwelling was justified under the emergency rule. *See, also, LaFournier v. State* 91 Wis.2d 61, 280 N.W.2d 746 (1979) ; *State v. Davidson,* 44 Wis. 2d 177, 170 N.W.2d 755 (1969), *State v. Hoyt,* 21 Wis. 2d 284, 128 N.W.2d 645 (1964). In both *Kraimer* and *Pires,* as in this case, the common circumstances are the existence of information indicating an immediate need to render aid or assistance to a person due to actual or threatened injury, and an immediate need to enter an area in which there is a reasonable expectation of privacy in order to provide that aid or assistance.

We hold that the objective test of the emergency rule is satisfied when, under the totality of circumstances, a reasonable person would have believed that: (1) there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance. In applying this analysis to the instant case, we conclude that under the totality of circumstances, a reasonable person would

have believed that the children within the Boggess residence were in immediate need of aid or assistance due to actual or threatened physical injury, and that there was an immediate need for entry into the home to provide that aid.

In asserting that the facts and circumstances confronting Hammel and McMahon do not support a reasonable belief that an emergency existed, Boggess relies on our decision in *Bies v. State,* 76 Wis. 2d 457, 470, 251 N.W.2d 461 (1977). In *Bies,* we indicated that an anonymous telephone call was not possessed of even minimal "indicia of reliability". Boggess also cites several United States Supreme Court decisions that discuss the use and reliability of information supplied by known and anonymous third parties to establish traditional probable cause to authorize issuance of an arrest or search warrant, or to justify a warrantless search or arrest. *See, e.g., Aguilar v. Texas,* 378 U.S. 108, 114 (1964) ; *Spinelli v. United States,* 393 U.S. 410 (1969) ; *McCray v. Illinois,* 386 U.S. 300 (1967) ; *Illinois v. Gates,* —— U.S. ——, 103 S. Ct. 2317 (1983).

In assessing the value and reliability of information provided by an anonymous informant for purposes of establishing traditional probable cause to issue a search warrant, the United States Supreme Court recently held that an anonymous informant's tip should be analyzed under a "totality of the circumstances" approach, which includes a balanced assessment of the relative weights of all indicia of reliability attending the information. *Gates,* —— U.S. at ——, 103 S. Ct. at 2330, 2332. Prior to issuing a warrant, a magistrate must make a common-sense decision whether, given all circumstances before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information,[11] there

[11] In *Aguilar v. Texas,* 378 U.S. 108 (1964), and *Spinelli v. United States,* 393 U.S. 410 (1969), the United States Supreme

is a fair probability that evidence of a crime will be found in a particular place. —— U.S. at ——, 103 S. Ct. at 2332. In determining the overall reliability of an anonymous informer's tip, the "totality of circumstances" approach permits a deficiency in indicia demonstrating an informer's veracity to be compensated for by a strong showing concerning the informer's basis of knowledge, or by some other indicia of a reliability.[12] *See Id.* at 2329.

---

Court established guidelines concerning the quantum of evidence that an officer must present to a magistrate to establish probable cause to authorize issuance of a warrant based upon hearsay information. The decision in *Aguilar* resulted in what is commonly referred to as a "two-prong" test, which is equally applicable when police claim they had probable cause to make a warrantless arrest or search. Under the first or "basis of knowledge" prong, facts must be revealed that permit a magistrate to determine whether an informant had a basis for his allegation that a certain person had been, was, or would be involved in criminal conduct or that evidence of a crime would be found at a certain place. The second or "veracity" prong requires that facts be presented to the magistrate to enable him to determine either the informant's inherent credibility or the reliability of his information on that particular occasion. See 1 LaFave, *Search And Seizure,* sec. 3.3 at 501–02 (1978).

In *Illinois v. Gates,* —— U.S. ——, 103 S. Ct. 2317 (1983), the court held that while the guidelines set forth in *Aguilar* and *Spinelli* are still relevant in assessing the reliability of third party information to determine traditional probable cause, they are not to be considered as separate and independent elements subject to a rigid application. Rather, they are among the relevant considerations to be assessed in a "totality of circumstances" analysis, which the court indicated was the controlling analysis for determining whether there is probable cause to issue a search warrant based, in part, upon an informant's tip.

[12] In *Illinois v. Gates,* the court noted:

". . . if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary . . . . Conversely, even if we enter-

Although the "totality of circumstances" analysis in *Gates* applies to situations involving the traditional probable cause determination, it is also relevant to an analysis of whether a reasonable person would have believed, under the totality of circumstances, that there was an immediate need to render aid or assistance due to actual or threatened physical injury, and that immediate entry was necessary. The totality of circumstances in this case must, however, be evaluated within the context of a possible emergency situation, which, by its very nature, involves potentially serious consequences if immediate action is not taken, and necessarily demands a prompt assessment of the information that is available.

As the United States Supreme Court noted in *Gates,* the veracity of persons supplying anonymous information is, by hypothesis, largely unknown and unknowable. *Id.* at 2332. That does not necessarily mean, however, that the information the person provided must automatically be discredited. The information must be assessed under the totality of circumstances. Such circumstances may include the presence of detail in the information, and corroboration of details of an informant's tip by independent police work. *See id.* at 2334, 2335–36. Detail that an informer provides is evidence that the manner in which he obtained his information was reliable, and it enables the recipient of the information to conclude that he is relying on something more than casual rumor or an accusation based on a person's general reputation. *See Spinelli.* In addition, corroboration of details contained in the information reduces the

tain some doubt as to the informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." 103 S Ct at 2329–30.

chances of a "reckless or prevaricating tale." *See Gates,* 103 S. Ct. at 2334.

In this case, unlike the anonymous caller in *Bies,* who provided only a vague statement that there was noise in the general area of the defendant's garage, the person who called Benesh provided detailed information. The caller identified two children by their last names (and at least one, if not both of the children, by the first name), gave Boggess' last name, and indicated by this that the children had different last names than Boggess. The caller did not simply make a generalized statement that the children had been abused but specifically indicated that L.S. had bruises and was limping. The caller also indicated that he knew the Boggesses fairly well, and that Calvin Boggess had a bad temper. The detail provided indicates that the caller was speaking from personal knowledge and not merely repeating an idle rumor. The caller's statements that he witnessed bruises on L.S. and that he knew the Boggesses fairly well also reflects his basis of knowledge, and indicates that he in all likelihood obtained his information from personal observation, not from gossip or rumor.

In addition, prior to entering the Boggess residence, Hammel indicated to Boggess that they were there to investigate the safety and welfare of the children. The fact that it was Boggess who answered the door of the residence to which Hammel and McMahon went, and that Boggess did not deny that children lived there but instead asked Hammel if she had a warrant, provided corroboration for at least portions of the information that the caller had provided to Benesh. Although the corroborated facts were "innocent" details, and not details concerning whether abuse had occurred or was occurring, the United States Supreme Court has recognized that "[b]ecause an informant is right about some

things, he is more probably right about other facts."
*Gates,* —— U.S. at ——, 103 S. Ct. at 2335, quoting *Spinelli
v. United States,* 393 U.S. at 427 (White, J., concurring).

The "totality of circumstances" in this case thus con-
sists of information provided on a Friday evening by
an anonymous caller concerning a potential emergency
situation requiring immediate medical aid or assistance
to injured children. The information contained several
details indicating that the caller had obtained the in-
formation firsthand, and Hammel and McMahon parti-
ally corroborated certain details provided in the informa-
tion prior to their entry into the Boggess residence.
Any deficiency in the veracity of the caller due to his
anonymity was compensated for by both the specific
detail contained in the information the caller provided
and by the corroboration of portions of that information.
*See Gates,* 103 S. Ct. at 2329. We therefore conclude
that under the totality of circumstances in this case, a
reasonable person would have believed that a situation
existed requiring an immediate need for aid or assis-
tance due to actual or threatened physical injury to the
children.

We also conclude that a reasonable person would have
believed that immediate entry was necessary to render
aid and assistance to the children. The caller indicated
that two children at the Boggess residence may have
been battered and needed medical attention. The caller
also indicated that one of the children was limping, and
that Calvin Boggess had a bad temper. The emergency
rule applies to situations in which there is a need to
render aid and assistance and avoid serious injury. *See
Kraimer,* 99 Wis. 2d at 314; *Wayne v. United States,* 318
F.2d 205, (D.C. Cir. 1963) (opinion of Burger, J.)

The situation confronting Hammel and McMahon
involved small children inside a home, who are less able

to protect themselves from further harm or to independently seek medical attention than are adults. The information that one of the children was limping indicates a potential need for that child to receive immediate medical attention. In addition, even if the physical abuse had already occurred prior to the time the caller contacted Benesh, the information that Calvin Boggess had a bad temper created the possibility that the children would be subjected to further abuse at any time, which could have resulted in serious injury or even death. We do not believe that a situation must involve only life-or-death circumstances in order to constitute an emergency within the emergency rule. Under the totality of circumstances in this case, a reasonable person could have believed not only that there was an immediate need to render aid or assistance to the children at the Boggess residence, but also that the need for entry into the home was immediate. Both elements of the objective test were therefore met.

Because the warrantless entry into the Boggess residence was justified under the emergency rule exception, the entry was reasonable and lawful. The evidence obtained pursuant to that entry, was, therefore, not the product of an illegal search, and the trial court properly denied the motions to suppress.

*By the Court.*—The decision of the court of appeals is affirmed.

DAY, J. (concurring). I agree with the majority opinion and write because I believe it is important that the dissent not go unchallenged.

On November 26, 1983, a nationally syndicated columnist published an article[1] saying that child abuse:

"... is the worst of crimes, against the most defenseless of victims. ... In 1981 there were 885,000

[1] Wisconsin State Journal, November 12, 1983, section 3, page 4.

reported cases of child abuse, twice as many as in 1976. Every year 5,000 children die at the hands of their parents. . . . [H]ospitals, police, social agencies and volunteer groups must be ever-vigilant. Anyone who suspects child abuse has an obligation to report it. When you look the other way you become a co-conspirator in the crime."

Had one or both of these children been killed because a social worker failed to insist on seeing them after receiving the information this agency had received one can well imagine the waves of outrage and disgust that would have swept through the community because of the social worker's failure to act.

Such a scenario points up how wrong the dissent is in its interpretation of the application of well settled principles of law.

It is important in this case to keep in mind that the anonymous caller to the social service staff named the children and their abuser, related that the children had been abused the day before,[2] related that one child, on the following day, was still unable to walk normally, that the children needed medical attention, and related that the abuser had a bad temper. The social worker having this information was absolutely justified in insisting on seeing these children and in entering the home without a warrant.

The need for medical attention for the children, caused by a beating administered by the stepfather mentioned by the "anonymous" caller, (the caller turned out to be the children's grandfather) turned out to be true; the mention of bruises on the bodies of the children turned out to be true; the mentioned limping of the boy caused by the beatings he had received turned out to be true; the bad temper of their tormentor mentioned by the caller turned out to be true. What wasn't mentioned by

---

[2] Affidavit of Joni Hammel on the criminal complaint.

the anonymous caller was that part of the little boy's lip was torn away and the wound dirty and inflamed, and that a three inch patch of his hair had been jerked out by his tormentor. The record shows that the little boy was five years old; his sister ten. Clearly the emergency doctrine had been called into play before the entry into the house by the social worker and was verified by the children's condition. In the face of these facts, the dissent would have us hold that the social worker should have turned her back on the children's reported plight when their attacker asked if she had a warrant!

The dissent further tells us we "value family autonomy and privacy and the sanctum of the home." (Dissent, p. 462). But the house was not just the abuser's home, it was also the home of these two children and they had a right to the protection and help this social worker rightfully gave to them in this case. Far from being a "sanctum," the house had more the characteristics of a torture chamber for these unfortunate children. This house was hardly "the source . . . of physical and emotional security" to which the dissent alludes. (Dissent, p. 462). To her credit, the social worker entered this house, saw the battered condition of these children and took them to the hospital where they could receive the needed medical attention and protection.

The dissent brushes aside the well supported position of the majority that this is clearly a case where the emergency doctrine applies, thus authorizing entry into a dwelling without a warrant.

But the dissent claims Ms. Hammel, the social worker, violated the stepfather's "constitutional right" against "unreasonable search and seizure" by coming to the rescue of these children. The dissent tells us:

"This case involves the delicate balance of two cherished values: protecting our children and protecting the family from coercive intervention by government agents."

"These values were in the balance when the social worker for Oconto County Department of Social Services responded to an anonymous report about children who might need protection." (Dissent, p. 463).

What is this "delicate balance" to which the dissent refers? The key word is "unreasonable" searches and seizures. The founding fathers left us with the means to protect ourselves from tyranny but they defined it in terms of human reasonableness. They did not direct or authorize us to substitute in its place some fanciful definition of what is reasonable. The failure to consider the nature of "unreasonable search and seizure" has in the dissent led to a decision to tip the "delicate balance," not in favor of the child-victims, but in favor of their tormentor!

The soaring rhetoric that stirs the hearts of lovers of liberty in exalting the constitutional protections which fend off the jack-booted soldiers of the king about to break down the cotter's door in search of pamphlets denouncing the king's tyranny somehow becomes a caricature, a farce, when the person knocking at the door is a social worker investigating a detailed and well-founded complaint of terrible abuse against two helpless children. To so trivialize the constitution is to make a mockery of the great document. The dissent doesn't protect rights —it seeks to create rights where none exist.

The age of enlightenment, of which our constitution is truly one of the great ornaments, exalted the role of human reason in man's quest for "life, liberty and the pursuit of happiness." Contemporary iconography showed this greatest of human attributes as a beautiful goddess. To rob reason of rational thought is to change her to a shriveled hag, reducing her from an object of adoration to one of derision and contempt.

We should not permit the Bill of Rights to be twisted into becoming a "Bill of Wrongs" in the perception of

the victims of crime. The shield protecting our civil liberties should not be refabricated into a cloak to hide and protect the child abuser in this case.

Contrary to the assertion of the dissent, this case does *not* "demonstrate a need for guidelines." (Dissent, p. 474). Quite the contrary. Here the well settled demands of the emergency doctrine were met. Each case must of necessity stand or fall on its own set of facts and be weighed in light of the standards this court has set.

The dissent would grant the defendant's motion to suppress the evidence the social worker gathered following her entry into the children's home and would not permit such evidence to be used in the defendant's trial. The majority disagrees. I agree with the majority.

I am authorized to state that JUSTICES WILLIAM G. CALLOW and LOUIS J. CECI join in this concurring opinion.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The gravity of child abuse and the urgent need for protecting its victims cannot be overstated. Children are our legacy and our hope, as valuable to us as they themselves are vulnerable. The centrality of children in our lives and the growing recognition of their sanctity as individuals have mandated that governments shield children from the exploitation of their vulnerability.

At the same time that our law and society recognize a child's right to and need for protection, our law and society value family autonomy and privacy and the sanctum of the home. The family is the primary unit of social organization, the source of the individual's physical and emotional security. We recognize these principles by according the individual federal and state constitutional protection of due process of law and protection from unreasonable searches and seizures. The pur-

pose underlying these constitutional protections is not, as it is often mistakenly perceived, to protect criminals but to minimize governmental intrusion into the everyday lives of ordinary citizens. To the extent that this court allows encroachment of the constitutional rights of the accused, it allows encroachment on the rights of all. We need to strengthen law enforcement tools, but we cannot justify practices that would otherwise fail to meet constitutional standards.

This case involves the delicate balance of two cherished values: protecting our children and protecting the family from coercive intervention by government agents.[1]

These values were in the balance when a social worker for the Oconto County Department of Social Services responded to an anonymous report about children who might need protection. More than two years later, this court, sitting 150 miles away, reviews her course of action not in the context of a proceeding to protect the children but rather in the context of a criminal prosecution. It was the defendant's actions, not the social worker's that brought this case before us. Yet beyond the significance of this case to the defendant, Calvin Boggess, lies its significance to the social workers and other officials upon whom the law has imposed the awe-

---

[1] The state's concern with both the abused child and the family is clearly expressed as follows in the Child Abuse Neglect Act:

"It is the purpose of this act to protect the health and welfare of children by encouraging the reporting of suspected child abuse and child neglect in a manner which assures that appropriate protective services will be provided to abused and neglected children and that appropriate services will be offered to families of abused and neglected children in order to protect such children from further harm and to promote the well-being of the child in his or her home setting, whenever possible." Ch. 355, sec. 1, Laws of 1977.

some responsibility of protecting and aiding children and families.

The issue in this case is not whether the social worker erred in promptly investigating the report. She did not err. The issue is whether she erred by carrying her investigation into the home without consent, without a warrant, and without checking into the anonymous report. This distinction between the duty to investigate all reports of child abuse and the power to enter a home without consent only under certain circumstances is an important one.

I agree with the majority that a government official may enter a home without consent and without a warrant to examine children under the "emergency" rule, that is, if, under the totality of circumstances, the official, at the time of entry into the home, has reasonable grounds to believe that "(1) there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance." *Supra,* pp. 452, 453; see also *supra,* p 445. Clearly the state must be empowered to act quickly when there is a true emergency imperiling the safety and welfare of a child.

While any report of child abuse is a critical matter, for purposes of government entry of the home an emergency, as the majority explains, means an *immediate* need to provide aid for actual or threatened physical injury and a need to enter the home *immediately* to provide that aid.

In the absence of *immediate* danger to the child the government official may not enter the home without either consent or a warrant. In our country a warrantless entry into a home by a government official is presumed unreasonable. *Payton v. New York,* 445 U.S. 573,

585–86 (1980) ; *Laasch v. State,* 84 Wis. 2d 587, 594, 267 N.W.2d 278 (1978).

When the child is in no immediate danger, the police and the county agency must nevertheless investigate a report of child abuse promptly—within 24 hours of the report. Sec. 48.981(1) (3), Stats. 1981–82.[2]

I part with the majority when it finds the "emergency doctrine" applicable in this case. I conclude from the record that the state did not prove—as it must—that the social worker, upon entry into the home, had reasonable grounds to believe that an emergency existed. *State v. Taylor,* 60 Wis. 2d 506, 519, 210 N.W.2d 873 (1973). The validity of the entry cannot be colored by knowledge obtained or events occurring subsequent to the entry into the home. The criminal complaint and other documents in the record contain information not available to the social worker when she entered the home. If hindsight is the test, no one of us is protected from the government's entry into our homes. This court is bound by the record setting forth the facts known to the social worker at the time of entry into the home, and this record is meager. This deficiency in the record may have been caused by the prosecutor, not the informant or the social

---

[2] The police, if requested, must conduct an "immediate" investigation "to determine if there is reason to believe that the child's health or safety is in immediate danger". Sec. 48.981(3) (b)1. The social worker is required "upon receipt of an initial report of suspected child abuse or neglect . . . to commence an appropriate and thorough investigation to determine whether the report is 'indicated' or 'unfounded.' The complete investigation shall, *if possible,* include a visit to the child's home or usual place of abode, observation of the child and an interview with the child and the child's parents or custodians." Sec. 48.981(3) (c)1. (Emphasis added.) "A finding of 'indicated' for child abuse reports shall be supported by a preponderance of the evidence available to the agency; . . . Whenever there is less than the required standard of evidence indicating child abuse or neglect, the report shall be classified as unfounded." Sec. 48.981(3) (c)3.

workers. But for the purposes of this review, it makes no difference.

Since the record is so important—and so brief—I shall set forth in the margin (note 3)[3] the entire testimony

[3] Benesh's entire testimony describing the anonymous telephone call was as follows:

"Q. Did you receive a call concerning a possible child abuse approximately around 5:00 o'clock or so on February 6, 1981?

"A. I believe that's the date, and I do know it was during the supper hour, yes.

"Q. And do you remember the substance of that call?

"A. Yes. I received a call that stated that the person who called had reasonable belief that some children may have been battered, and that were in need of medical attention.

"Q. Did the person identify who the children were, and the residence?

"A. Yes, he did.

"Q. During that call did the person indicate that there was a possible dangerous situation there?

"A. Yes.

"Q. Okay. What was that? How did he state that?

"A. The caller just felt that because of bruises that the caller witnessed on the person of [L.S.] indicated to him that he may have further damage done to his body and that he should be checked out by a doctor. I believe he also indicated at that time that [L.S.] was limping.

"Q. Okay. Did the caller indicate any concern about the nature of Calvin Boggess?

"A. The caller informed me that Mr. Boggess has a bad temper, and may be upset about someone coming to his house in that regard.

"Q. Did the caller indicate that he knew the Boggesses fairly well?

"A. Yes, he did.

"Q. Did you relate this information then to Joni Hammel?

"A. Yes, I did.

. . .

"Q. Mr. Benesh, approximately when did you call Joni Hammel that evening?

"A. I called her immediately after I finished talking with the caller who called me.

about the anonymous telephone call and the information available to the social worker at the time of entry into

"Q. Is there a reason why you did not go out to the Boggess home yourself that day, or the next day?

"A. Yes, because we have a rotating basis for social workers to be on call. It is a paid basis, and therefore calls of that nature are to be handled by whoever is on intake that evening. So, I related it to the intake worker.

. . .

"Q. You testified that the caller informed you that these children may be in need of some medical care. Did the caller advise as to his or her opinion as to what caused the problem?

"A. I believe he did say that he thought it was a result of a beating.

"Q. Did the caller have any information for you as to just when this beating may have taken place?

"A. No, he did not.

"Q. Mr. Benesh, how long have you worked in your present position in Oconto County?

"A. Over four years.

"Q. Is it the policy of your department to check any allegations of child abuse within 24 hours of a call?

"A. Yes, it is. And most times we go immediately on those calls."

(tr., pp. 40–43)

Hammel's entire testimony describing her telephone conference with Benesh, her description of Benesh's telephone call to McMahon, and her statement to McMahon and the defendant of her purpose in entering the Boggess residence is as follows:

"Q. And did you receive a call at approximately oh, around 5:00, 5:30 p.m. on February 6, 1981?

"A. Yes, I did.

"Q. And what was the substance of that call?

"A. The call was from another social worker from our department. And he received a phone call from a person who wished to remain anonymous that two minor children were most likely in need of medical care, and that the intake worker should get out there and look at those children.

. . .

"Q. And did you explain to Officer McMahon the purpose of your meeting him there?

the home, including the testimony of social worker Benesh, who received the call; of social worker Hammel, to whom

"A. I explained to him that I had received a phone call that the health and safety, or welfare possibly, of two children was in question, and that is where we were going.

"Q. Then did you go to the Boggess residence?

"A. Yes, we did.

"Q. Okay. And when you arrived at the home what happened?

"A. When we arrived at the home we went to the door. To me it seemed like the back door. It was both the officer and myself. I was in the front, and I knocked on the door. Mr. Boggess answered the door. I stated my name, where I worked, and the reason I was there for, to see the children, that the safety and possibly the welfare of their condition was in condition [sic]. That someone had phoned us. And he asked for a warrant at that time.

"Q. Mr. Boggess did?

"A. Yes, he did.

"Q. Okay. And—

"A. And I explained to him that by the Children's Code a warrant is not necessary for minor children.

. . .

"Q. Once you got into the home, who did you observe in the residence?

"A. Mr. Boggess, Mrs. Boggess, and two minor children.

. . .

"Q. Do you work quite frequently in the evening?

"A. I work once every sixth week as an intake worker.

"Q. So, you were on duty that evening?

"A. Yes, I was.

"Q. Were you on duty the next day?

"A. Saturday, yes, I was.

"Q. Was there any special reason why you went to the house that night as opposed to waiting until the next day?

"A. Our job requires us to go when we are called.

. . .

"Q. Are you required to go out to a home within so many hours after getting a call involving alleged child abuse? Is there any policy on that?

"A. Yes, there is. In the Children's Code.

"Q. And what is the policy?

"A. I believe it is 24 hours. Within 24 hours of the phone call. I am not sure, though."

(tr. pp. 20–36)

Benesh described the call; and of traffic officer Mc-Mahon, who accompanied Hammel to the Boggess home.

Benesh's testimony reveals that the telephone caller did not convey a sense of immediate need for aid or entry. The caller related, according to Benesh, that the caller "had a reasonable belief that some children may

Officer McMahon's entire testimony describing his meeting with Ms. Hammel and their entry into the home is as follows:

"A. . . . I met Miss Hammel at Yancy's Restaurant. And at that time she explained to me she was going out into the Town of Underhill to a Calvin Boggess residence to check on the welfare of two children. And she said from the complaint she received if she were to take custody of the children that Mr. Boggess might have a wicked temper, or something, and she asked me to go along for her own protection if she did take the children into custody.

"Q. So then you proceeded to the Boggess residence?

"A. That is correct, sir.

. . .

"Q. And you went up to the front of the house?

"A. We went up to the door, which is on the west side of the house, and Miss Hammell knocked on the door.

"Q. Okay. And who opened the door? Do you remember?

"A. I don't recall which one opened the door.

"Q. Who was present at the Boggess residence?

"A. Mr. Calvin Boggess, his wife and two minor children.

"Q. Okay. Now, when you were up there, did you identify yourselves?

"A. Miss Hammel identified herself as an agent of the Social Services Department, and me as a member of the Oconto County Traffic Department.

"Q. And did you obtain entrance into the residence?

"A. Yes.

"Q. Okay. Did you say anything at that point?

"A. No. Miss Hammel stated the reason that we were there.

"Q. Okay. What was the reason?

"A. To check on the welfare of two minor children.

"Q. Okay. Once you got into the residence, who did you observe? Did you observe more than Mr. Boggess and Mrs. Boggess?

"A. I observed two minor children. A male and a female."

(tr. pp. 4–5)

have been battered [at an unstated time] and that [*sic*] were in need of medical attention."

While Benesh agrees to the district attorney's description that the caller indicated "a possible dangerous situation," in answering the district attorney's question to describe the caller's statement, Benesh responded: "the caller just felt that . . . [the children] should be checked on by a doctor." Despite the caller's cautious language, there is a clear basis for an investigation. But this is not the issue. The issue is whether the social worker had reasonable grounds without further investigation to believe immediate aid and immediate entry of the home were necessary.

Benesh and Hammel testified that they treated this report in the same way that they treated all reports of child abuse. They responded promptly. At most two and three-quarters hours elapsed between the report and the entry of the home. The lapse of more than two hours was not explained, and need not be if this was an investigation under sec. 48.98. But that unexplained time lapse is not consistent with a belief that two children needed immediate aid by way of immediate entry in the home.

Assuming arguendo that the caller had asserted there was an immediate need for aid and entry, the question remains, as the majority explains, whether the information provided by the anonymous informant is sufficiently trustworthy to authorize a government official's nonconsensual entry of the house. The federal and state constitutions require some assurance before the entry that such official action is based on information given by an honest or credible person who obtained the information in a reliable way. *Aguilar v. Texas*, 378 U.S. 108 (1964) ;[4] *Spinelli v. United States*, 393 U.S. 410 (1969) ; *Illinois v. Gates*, —— U.S. —— 103 S. Ct. 2317 (1983).[5]

---

[4] "[T]he magistrate must be informed of some of the underlying circumstances from which the informant concluded that the

Police officers presumably report reliable information. Anonymous informants do not enjoy a presumption of reliability.[6] As the majority explains, an anonymous in-

narcotics were where he claimed they were [basis of knowledge], and some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable' [veracity]." *Aguilar v. Texas*, 378 U.S. at 114.

The *Gates* opinion and today's majority both acknowledge the continued vitality of these concerns. Although under the totality of circumstances test promulgated in *Gates*, a deficiency in one prong may be compensated for by a strong showing in the other prong, it seems necessary to require some threshold of supporting facts as to both veracity and basis of knowledge before allowing the proficiency of one prong to compensate for the deficiency of the other.

[5] While *Illinois v. Gates* retains the need to show the informant's veracity, reliability, and basis of knowledge, it also adopted a "totality of the circumstances" analysis. The forthcoming pocket part to Professor LaFave's Search and Seizure treatise comments on *Gates* as follows:

" 'Gates does not mean that lower courts are writing on a completely clean slate when they now confront the question of whether an informant's [tip] amounts to probable cause. Even the Gates majority agreed "that an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." Because this is so, it is to be hoped that the courts will continue to place considerable reliance upon the elaboration of these factors in earlier cases decided under the now-discarded Aguilar formula.' " Quoted at 52 L.W. 2230 (1983).

Some of the reasoning in *Gates* leads one to believe that the *Gates* decision is limited to warrant cases; other parts of the *Gates* opinion lead one to believe that the Court would apply *Gates* in nonwarrant situations. The *Gates* opinion, a 5–4 decision, is open to several interpretations. *See* the report of Professor Kamisar's discussion of *Gates* at 52 L.W. 2229–30 (1983).

[6] One commentator has suggested that anonymous informants should be treated as presumptively unreliable. Comment, *Anonymous Tips, Corroboration and Probable Cause: Reconciling the Spinelli/Draper Dichotomy in Illinois v. Gates*, 20 Am. Crim. L. Rev. 99, 107 (1982).

formant's report can, however, supply the basis for reasonable belief in an emergency if the information included apprises the government official of the informant's basis for concluding there was a child abuse emergency (the "basis of knowledge" prong) and the social worker has a basis for believing that the informant is credible (the veracity prong).

Whatever the cause of the deficiency of the record, the report as described by the social workers had very little detail. The caller did refer to "bruises" but without describing the location or extent or when they were inflicted. Benesh testified "he believed" the caller said a child was limping. The caller apparently said nothing about the condition of the second child and apparently did not give the ages of the children. The caller did not claim to be an eyewitness or divulge how he got his information. Benesh was never asked whether he pressed the caller for more details or whether the caller was unwilling or unable to supply them. The majority attributes significance to the inference it derives from the record that the caller identified two children by their last names (and at least one, if not both of the children, by the first name), indicating that the children's names were different from the defendant's. This is simply not enough.

Since the "details" in the report are not sufficiently extensive to be "self-verifying," the report in and of itself cannot pass the "trustworthy" test under the totality of the circumstances. Indeed the majority opinion stresses the corroboration of the details of the report.

Independent corroboration by government officials could make the report trustworthy. This court and the United States Supreme Court have "consistently recognized the value of corroboration of details of an in-

---

Anonymity is not encouraged because of the obvious dangers of a report for which no one is willing to take responsibility.

formant's tip by independent police work." *Illinois v. Gates*, —— U.S. ——, ——, —— S. Ct. ——, —— (1983).

The only independent corroboration undertaken in this case occurred when Hammel and McMahon went to the defendant's home. There they verified the name and address apparently reported by the anonymous informant. The defendant neither denied nor admitted there were children in the home. The presence of children, their names, and their physical condition were not corroborated until after the social worker entered the home. Corroboration of "innocent details" may increase the probability that the uncorroborated allegations in the anonymous report are true. But even assuming, as the majority does, that a failure to deny that children lived there rises to the level of an admission, what little corroboration existed here was not sufficient to buttress the veracity or reliability of the anonymously communicated information.

In the two-plus hours between the telephone call and the entry into the home, no effort was made to corroborate the facts of a child abuse emergency. Oconto is a small county with a population of approximately 29,000; it was a Friday evening and the defendant lived "out in the county." Some of these factors may have made information-gathering an easier task and others a harder task, but telephone calls to neighbors, family members, clinics, hospitals, police departments, the sheriff's office, or school officials might have yielded information about the children or family situation. The agency did not check its own files to determine whether it had had any prior contact with the family. These sources may not have verified that an emergency existed at the Boggess residence, but almost certainly they could have provided some information about the probability of one.

When time allows, it is reasonable to expect the government official to make an effort to gain some assur-

ance of the truthfulness of anonymously communicated information to justify entering a home. Statistics on the subject of child abuse reporting demonstrate that such verification is essential. There is, at one and the same time, extensive overreporting of unfounded child abuse and serious nonreporting of actual child abuse. Besharov, *Child Protection: Past Progress, Present Problems, and Future Directions,* 17 Family L.Q. 151, 161–63 (1983).

In 1978 only 30 percent of reports of child abuse made anonymously were found to be valid.[7] The requirement that officials make some effort to substantitate the trustworthiness of anonymous reports before entering a home when there is time to get the information works no significant hardship. Anonymous informants are a minor source of reports of child abuse and neglect: in 1978, they constituted only 5.7 percent of all such reports nationally.[8] In 1982 anonymous reports accounted for 9.8 percent of all reports in Wisconsin.[9] In 1982 Oconto county apparently investigated a total of 12 reports of child abuse and child neglect.[10] I recognize that the social worker may frequently be subject to severe pressures to act swiftly on ambiguous information. This case, however, does not present such a situation.

This case demonstrates the need for guidelines to aid those who must respond to reports of child abuse so that

[7] Besharov, *The Legal Aspects of Reporting Known and Suspected Child Abuse and Neglect,* 23 Vill. L. Rev. 458, 470 (1978), citing file data of National Center on Child Abuse and Neglect, Department of Health, Education and Welfare.

[8] U.S. National Center on Child Abuse and Neglect, Department of Health and Human Services, National Analysis of Official Child Neglect and Abuse Reporting in 1978, p. 19.

[9] Wisconsin Department of Health and Social Services, Division of Community Services, Annual Report to the Governor and the Legislature on the Wisconsin Child Abuse and Neglect Act, p 12 (August 1983).

[10] *Id.* at Table 1.

the important state interests of protecting children and of protecting families against unreasonable governmental intrusion into their homes and lives are both preserved. *See* Sampson, "Statutory Regulation of Emergency Taking of Possession of a Child by State Governmental Entity," and Davidson, "Legal Challenges in Child Protection—An Agenda for the 80's," in *Protecting Children Through the Legal System*, pp. 92–120, 956–58 (ABA 1981).

I, like Judge Foley who dissented in the court of appeals, would reverse the conviction and remand for a new trial.