OPINION
{¶ 1} George Lane appeals from his conviction of one count of possession of crack cocaine (100 grams) with an attached major drug offender specification pursuant to his no contest plea.
 {¶ 2} Prior to trial, Lane moved to suppress evidence of the drugs recovered by the police and possession of which Lane was charged. At the suppression hearing evidence was presented that the Dayton Police dispatcher received an anonymous call that George Lane at 831 Dennison was selling drugs around two children and abusing them and one of the children had a busted lip. Several police crews responded to the call and all arrived about the same time. Specifically, Officers William Gross, Mikki Sewell, and Philip Adams arrived at the same time and approached the front door of the Dennison address, which was a duplex.
 {¶ 3} Officer Adams testified he went to the front door and knocked and Lane came to the door. Adams said the officers told Lane why they were there and he asked Lane if there were any kids in the house and Lane replied there were no children present. Adams said at that point a child walked toward the front door. Adams asked the child if he was all right and he did not observe any injuries on the child. Adams said he had Lane step outside on the porch and Officer Gross asked Lane if they could go inside and check for any more children and while he initially responded it was all right to do so, he changed his mind and asked his neighbor to close the door. (T. 76, 77). Officer Gross recognized this as rescission of permission to enter the home. Also, the neighbor, Deborah Williamson, indicated that she was babysitting the other child and she told the officers that the other child was in her house. (Tr. 124-125). Despite the rescission of consent and the indication by the neighbor that the other child was in her home, Gross proceeded to enter the home to check for a second child. (Tr. 27).
 {¶ 4} Upon entry into Mr. Lane's home Officer Gross saw marijuana on a coffee table and crack cocaine on top of a television set. At this point Gross told other officers to handcuff Lane and place him in a police cruiser. Gross then searched Lane's duplex for the other child but he could find no one else in the home.
 {¶ 5} Patrolman Phillip Adams placed Lane in the police cruiser and learned that Lane had a warrant for his arrest. Adams said Lane became agitated after he was placed under arrest. Adams said Lane knew Officer Gross had found marijuana inside his house and he volunteered that he had crack cocaine in his back bedroom. (T. 81). Adams said he then informed Officer Mikki Sewell of Lane's admission. Adams testified he then searched Lane's bedroom with Officer Sewell and discovered a large piece of crack cocaine in a coat pocket in the bedroom closet. Lane was then transported to the county jail and charged.
 {¶ 6} At the conclusion of the hearing, the trial court made the following factual and legal findings:
 {¶ 7} "The events of this case stem from an anonymous call dispatched to the Dayton Police staff reporting suspected child abuse at the residence 831 Dennison Ave. in Dayton, Ohio. No information was adduced at the hearing as to the details of the call nor as to the reliability of the informant, other than that there were two children, possible subjects of abuse, one of whom had a reported busted lip. Four cruisers arrived at the scene since this was an area where crowds tended to gather.
 {¶ 8} "The evidence is not clear as to which officer first arrived at the scene. Officer Gross stated he first approached the defendant, George Edward Lane, and informed him of the purpose of his call — alleged child abuse. Officer Adams stated that he was there and did the talking. He indicated he was investigating possible child abuse and drug charges. (He knew the defendant from a prior `job'.)
 {¶ 9} "When the officers arrived, Gross stated that the defendant answered the door followed by a child, assumably one of the children in question. The child lived at 831 along with his sister, mother and defendant. There was no testimony to indicate that this child had a busted lip or that he showed any other indication of abuse.
 {¶ 10} "The defendant informed Officer Gross that there was no one inside at about the time the child, Marcus, came up to the door. Both had been inside taking a nap. Gross then told defendant he wanted to go inside the duplex to look for the other child and was told to go in. Before doing so, the defendant's aunt came out of the adjoining duplex and after a brief discussion she was told to lock his door. The officer conceded that he understood this to mean that he was being refused entry, that the consent had been rescinded.
 {¶ 11} "However, he stated that he was going in regardless, for the welfare of the other child. At this point there is a substantial divergence in the testimony. The aunt, Deborah Williamson, was stopped from locking the door. Her protests were apparently ignored by the Dayton police. She questioned the lack of a warrant and the absence of a worker from Childrens' Services. She also informed them that she took care of the two children while their mother was at work and that they were fine, that the other child was in her side of the duplex.
 {¶ 12} "Ms. Williamson stated she was ignored. Nobody asked to see the other child, something which strongly suggests that the focus of the investigation was not the children nor their welfare. Officer Gross, as he stated, went into defendant's residence without consent and immediately saw marijuana and crack cocaine on a table. Defendant was thereupon arrested, placed in cuffs and put in the back of one of the cruisers.
 {¶ 13} "In the cruiser Officer Adams asked defendant for his social security number, which revealed an active warrant for his arrest. Defendant then became agitated and told Adams he wanted to come clean and told him about the location of other crack cocaine. A large amount of crack cocaine was subsequently found in defendant's coat pocket in a closet at 831 Dennison Ave.
 {¶ 14} "Two days later the defendant was interviewed, while in custody, by a Det. Rodney Sewell. In the process of receiving his Miranda rights the detective testified that the defendant stated that maybe he'd better wait to talk with an attorney. The detective started to gather up his things, terminating the interview, but the defendant then went on and said: `OK, I'll tell you the truth.' (sic) and a statement was given.
 {¶ 15} "The fact pattern presented in this case raises several legal and constitutional questions. The fundamental issue is the warrantless entry into the premises at 831 Dennison Ave.
 {¶ 16} "It is very clear that no warrant would have issued for a search on the basis of an anonymous tip of the sort described above. The informant and his or her reliability were not known. Uncorroborated allegations of abuse of two children, one with an injured lip, an address, and possibly the name George Lane was the sum total of the information the police had.
 {¶ 17} "On arrival the defendant gave `Ed' as his name. It was his middle name, but the police interpreted this as deception. He also saidhe was alone when the younger of the two children came up to the doorwith him (emphasis added). The child had gone over to the other side of the duplex to nap, which the aunt explained. Defendant's full name was never inquired about.
 {¶ 18} "Answers given by the defendant, in light of all the surrounding testimony, do not give rise to probable cause to search the residence of the defendant. A very brief follow up to the statements of Deborah Williamson would have demonstrated to the officers that there was no cause for concern and no probable cause for any search. Both children were available and healthy.
 {¶ 19} "The case of Maumee v. Weisner (1999), 87 Ohio St.3d 295
rejected the line of Ohio cases holding that reliance on a dispatch alone is sufficient to justify a reasonable suspicion of criminal activity. It is the obligation of the state to demonstrate that the facts precipitating the dispatch `justified a reasonable suspicion of criminal activity.' The necessary investigation on this case would have shown the tip to be false and the entry into the home to be without cause.
 {¶ 20} "The state next argues that the defendant, George Lane, consented to the entry and search when Officer Gross asked permission to go in to look for the other child. He did, but before entry was made he told his aunt to `seclude' his home and she tried to lock his door, but was physically obstructed. Officer Gross testified he understood this to mean that the consent had been withdrawn.
 {¶ 21} "The prevailing rule in Ohio is that consent may be limited or withdrawn even after a search has started. State v. Rojas (1993),92 Ohio App.3d 336 and State v. Mack (1997), 118 Ohio App.3d 516.
 {¶ 22} "The court accordingly finds that the initial entry into the residence of Defendant Lane was not consented to and without probable cause. The authorities were therefore not properly in a place where the contraband in this case would be in plain view. The arrest was thus unlawful.
 {¶ 23} "The next question before the court is whether the statement offered by defendant while in the back of the cruiser to the effect that he wanted to `come clean' and that they could find crack in his coat in the closet should be suppressed.
 {¶ 24} "Counsel for the defendant argues that the suggestion that the police look for the crack cocaine in the pocket of his coat hanging in his closet was not a voluntary consent, given the arrest, but rather the fruit of an unlawful arrest under Wong Sun v. United States (1963)371 U.S. 471. To a certain extent this is correct.
 {¶ 25} "However, the unchallenged testimony of Officer Adams made clear that when the defendant was being processed in the cruiser he was asked his social security number and, when it was run through the computer, Adams learned that there was an outstanding arrest warrant for the defendant. When he was informed of this, he became agitated and, without any questioning whatsoever, stated that he wanted to come clean. The defendant accurately described for the police where they could find a sizable quantity of crack cocaine.
 {¶ 26} "This information is tantamount to a confession and consent and is arguably tainted by the original arrest. On the other hand, the defendant was under arrest by virtue of the outstanding arrest warrant and that was not tainted. That information about the warrant could have been legitimately obtained at any time during this encounter.
 {¶ 27} "Counsel for the State cites the case of State v.Retherford (1994), 93 Ohio App. 3d 586. This holds that an illegally detained defendant's consent is vitiated unless the government proves that it was not `the product of the illegal detention', but `the result of an independent act of free will.'
 {¶ 28} "The information turned over to the police was given voluntarily and without any questioning. The court can thus only conclude that the crack cocaine found by the police on re-entry into the residence was constitutionally seized and is properly subject to introduction as evidence.
 {¶ 29} "The final issue before the court involves the confession made to Det. Rodney Sewell two days after the arrest. For purposes ofWong Sun this statement was given at a time so attenuated that any taint is dissipated. The detective was in the process of giving the Miranda warnings when the defendant stated: `Maybe I'd better wait to talk with an attorney.' Sewell assented and started gathering up his things when defendant changed his mind again and said he'd agree to tell the truth. Sewell then finished giving the Miranda warnings and defendant was willing to give a statement.
 {¶ 30} "First, it is difficult to find that there was an unequivocal demand for an attorney. The defendant appears to have been asking himself, thinking out loud, if this would be advisable. When Sewell obliged, the defendant, on his own and with no badgering, answered his own question: `OK, I'll tell you the truth.' The statement of defendant, marked as State's Exhibit 2, was given voluntarily, after Miranda warnings and may properly be used as evidence in this case.
 {¶ 31} "The court finds no prejudice to defendant with respect to discovery issues. In the future the State can and should take measures to assure receipt by the defense of all discovery.
 {¶ 32} "Thus the motion of the defendant to suppress is overruled with respect to the statement and the crack cocaine found in the jacket in the bedroom closet, but is otherwise sustained. IT IS SO ORDERED."
 {¶ 33} In his first assignment, Lane contends that his admission that he had drugs in his bedroom was the product of an illegal detention. The State for its part argues that the statement was made after a valid arrest once police learned Lane was wanted on an outstanding arrest warrant and therefore his statement was not the fruit of an illegal arrest, citing Dayton v. Click (Oct. 5, 1994), Montgomery App. No. 14328. We agree.
 {¶ 34} We also believe that Appellant's statement was not the fruit of an illegal search. See Wong Sun v. United States (1963), 371 U.S. 471,83 S.Ct. 407. One of the specifically established and well-delineated exceptions to the warrant requirement is the rule that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Mincey v. Arizona (1978), 437 U.S. 385, 392,98 S.Ct. 2408. The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers.United States v. Barone (C.A.2, 1964), 330 F.2d 543, 545.
 {¶ 35} The Supreme Court of Wisconsin addressed similar facts inState v. Boggess (1983), 115 Wis.2d 443, 340 N.W.2d 516. InBoggess, an anonymous caller indicated that two children at defendant's home may have been battered and needed medical attention, and also indicated that one of the children was limping, and the defendant had a bad temper. The Court upheld the warrantless entry of the defendant's home and noted the objective test of the emergency rule exception is satisfied when, under the totality of the circumstances, a reasonable person would have believed that there was an immediate need to provide aid or assistance. Like the anonymous call in Boggess, the call in this case contained some specificity. It specifically indicated George Lane at the Dennison address was selling drugs around two children and abusing them causing one to suffer a busted lip. It is also relevant that Lane denied there were any children in his home before one child suddenly appeared. Also, the police could have become even more suspicious of Lane's conduct when he withdrew his permission to permit the officers to look for the other child. Although it is close, we believe the police could have reasonably believed that the other child mentioned in the call was in need of immediate aid at the time they entered Lane's home. The drugs discovered in the living room were discovered in plain view after the lawful entry. The first assignment of error is overruled.
 {¶ 36} In his second assignment, Lane contends the trial court erred in overruling his motion to suppress the drugs seized from his bedroom closet based on information gained by police during an illegal detention. In support of his assignment, Lane argues also that the search of his bedroom was an unreasonable search and seizure because he did not consent to the search of his bedroom and the police did not have a search warrant prior to conducting the search that revealed the drugs which formed the basis for the indictment.
 {¶ 37} The State argues that Lane gave a voluntary statement to the police after he was arrested on the outstanding arrest warrant and the search of his bedroom was pursuant to Lane's consent to do so. The State argues that since Lane's statement was "unprovoked and specific as to location," the officer reasonably believed they had consent to enter Lane's bedroom to conduct the search and seize the drugs.
 {¶ 38} Officer Adams was not asked at the hearing whether he viewed Lane's statement to him as an implied consent to search his bedroom for the drugs. He was asked by the prosecuting attorney whether he heard Lane yell out any objection to the officers' re-entering his house to search it and Adams replied he did not hear anything. Adams said Lane was seated handcuffed in the cruiser and seemed "kind of upset." (T. 114).
 {¶ 39} When the prosecution relies upon a consent search theory, it has the burden of establishing that the consent was voluntary by a preponderance of the evidence. Bumper v. North Carolina (1968),391 U.S. 543, 88 S.Ct. 1788. Mere acquiescence to a claim of lawful authority cannot discharge this burden. Bumper, supra. The consent may be in the form of words, gesture, or conduct. Robbins v. McKenzie (C. A.1, 1966),364 F.2d 45, 48-49, certiorari denied (1966), 385 U.S. 913,87 S.Ct. 215.
 {¶ 40} Courts and commentators have recognized that "consent [to search] may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search." Kuras, et al., Warrantless Searches and Seizures (2002), 90 Geo.L.J. 1130, 1172. "Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: `You have my permission to search.'" United States v. Better-Janusch (C.A.2, 1981), 646 F.2d 759, 764. See, also, United States v. Wesela (C.A.7, 2000), 223 F.3d 656, 661 ("The district court reasonably concluded that Mrs. Wesela at the very least implicitly consented to the search.");United States v. Gordon (C.A.10, 1999), 173 F.3d 761, 766
(10th Cir. 1999) ("Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."); UnitedStates v. Gilbert (C.A.9, 1985), 774 F.2d 962, 964 (9th
Cir. 1985) ("Appellant's request that the officers obtain her clothing necessarily implied consent to enter the bedroom in which she said the clothing was located."); United States v. Better-Janusch (C.A.2, 1981),646 F.2d 759, 764 ("Moreover, it is well settled that consent may be inferred from an individual's words, gestures, or conduct."); UnitedStates v. Turbyfill (C.A.8, 1975), 525 F.2d 57, 59 ("An invitation or consent to enter a house may be implied as well as expressed.").
 {¶ 41} In People v. Superior Court (1974), 41 Cal. App.3d 636, police responded to an emergency call and discovered a dead body in the living room of the defendant Opal Henry. Police found Mrs. Henry on a living room couch visibly upset. She explained she had been attacked by the victim and stated she had shot at him but missed. When the policeman asked where the gun was, she replied it was in a bedroom dresser drawer and offered to show the officer where it was. Henry was then removed from the residence, and the officer entered the bedroom and saw the gun in a partially opened dresser drawer. It was later seized by the police. The trial court suppressed the gun recovered in the dresser drawer. The court of appeals reversed, finding it was clear that Henry's statement about the location of the gun amounted to an implied consent to look for it. The court noted "words may imply consent as well as express it."Id. At 639.
 {¶ 42} In Nerell v. Superior Court (1971), 20 Cal. App.3d 593, police officers discovered marijuana while arresting a defendant in his bedroom. When the officers discussed their discovery with a co-defendant in the living room, the co-defendant blurted out, "all right you got me. It is in the case." Id. At 598. The officers searched the briefcase in the bedroom and recovered amphetamines and marijuana. The court concluded the co-defendant's spontaneous implied admission to the effect that the briefcase contained contraband was sufficient to constitute an invitation to the officers to examine the briefcase's contents.
 {¶ 43} The standard for measuring the "scope" of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect? Florida v. Jimeno (1991),500 U.S. 248, 251, 111 S.Ct. 1801.
 {¶ 44} We believe that it was objectively reasonable for Officer Adams to believe that Lane's statement in the cruiser to him that there were other drugs in his bedroom was an invitation by Lane to him to enter his house and retrieve them. This is so particularly since Lane had seen the police enter his home just minutes earlier and find drugs in his living room. The second assignment is overruled.
 {¶ 45} The judgment of the trial court is affirmed.
GRADY, P.J., and DONOVAN, J., concur.