OPINION
{¶ 1} Defendant-appellant, Adam Cheadle, appeals the judgment of the Portage County Municipal Court, Kent Division, denying his motion to suppress evidence. We affirm the judgment of the lower court. *Page 2 
 {¶ 2} On March 22, 2007, Cheadle was charged with one count of Voyeurism, a misdemeanor of the first degree, in violation of R.C. 2907.08. Cheadle, a student at Kent State University, shared a dormitory suite with three other male students, which consisted of two individual living rooms with a shared bathroom and separate bedrooms. The charges arose from an incident occurring on March 19, 2007, in which Cheadle allegedly used either a camera, cell phone, or a mirror to observe one of his suitemates while he was showering. The victim of the incident allegedly made a report to his resident advisor, who notified campus police.
 {¶ 3} Later on the day of the incident, Officer Jeff Futo arrived at the suite to interview the victim. He entered through the door to the victim's suite. After speaking with the victim about the incident, he went through the bathroom to Cheadle's living room, where he interviewed Cheadle. When the stories of the two did not coincide, Officer Futo interviewed both the victim and Cheadle further, going back and forth between the rooms. Eventually, Cheadle admitted that he had observed the victim in the shower with a mirror, which he hid inside a bottle of detergent after being confronted about the incident by the Resident Advisor. He also prepared a written confession on his own computer, in which he admitted that he "had used a mirror to observe the suitemate showering and that I had lied to the officer and the RA about the situation to save myself embarrassment." Cheadle further admitted, when questioned, that his conduct was for sexual gratification purposes, stating that he "was looking at him in the shower because I am a homo and I was interested in him." In addition, Cheadle gave Officer Futo the bottle of detergent allegedly containing the mirror. *Page 3 
 {¶ 4} On April 5, 2007, Cheadle entered a plea of "Not Guilty," and was released on his own recognizance.
 {¶ 5} On May 16, 2007, Cheadle filed a Motion to Suppress, with a supporting memorandum. In his motion, Cheadle sought to suppress any testimonial statements made to Officer Futo, the written confession, and the detergent bottle, asserting that such evidence was the result of a warrantless entry into his dorm room, and a custodial interrogation without an accompanying Miranda warning.
 {¶ 6} The trial court held a hearing on Cheadle's motion on July 3, 2007. On September 20, 2007, the court issued a judgment entry denying Cheadle's suppression motion. Cheadle subsequently entered a plea of "No Contest" to the charge, and was sentenced to 60 days in jail and a $500 fine, with the trial court suspending the jail sentence and $400 of the fine on the condition that Cheadle not violate any law or ordinance, except for minor traffic ordinances, for a period of one year; that Cheadle complete 36 hours of community service; that he have no contact with the victim; that he undergo a counseling evaluation and follow all recommendations; and that he serve a period of ten days of electronically monitored house arrest, with release for classes and work, if employed.
 {¶ 7} On September 27, 2007, Cheadle appealed the trial court's judgment overruling his motion to suppress. On September 28, 2007, Cheadle filed a motion with this court to stay execution of his sentence pending the outcome of this appeal. We granted Cheadle's motion, in part, staying the requirement that he complete the house arrest and community service, as well as the payment of the fine and court costs, conditioned upon his continuing compliance with all other court orders, including the no *Page 4 
contact order with the victim, and the posting of a supersedeas bond. We denied the portion of Cheadle's motion requesting a stay with regard to his compliance with the trial court's counseling order.
 {¶ 8} On appeal, Cheadle raises the following assignment of error for our review:
 {¶ 9} "The trial court erred in overruling Appellant's Motion to Suppress incriminating statements, written confession, and tangible items seized from evidence."
 {¶ 10} An appellate court's review of the grant or denial of a motion to suppress presents a mixed question of law and fact. State v.Norman, 136 Ohio App.3d 46, 51, 1999-Ohio-961 (citation omitted). In a motion to suppress, the trial court acts as the trier of the facts and, as such, is in the best position to resolve factual issues and assess the credibility of witnesses. State v. Dohner, 11th Dist. No. 2003-P-0059, 2004-Ohio-7242, at ¶ 10 (citations omitted). When considering the trial court's ruling on a motion to suppress, an appellate court is bound to accept the trial court's findings of fact as long as these findings are supported by competent and credible evidence. Id. citing State v. Searls (1997), 118 Ohio App.3d 739, 741. Accordingly, this court will review a trial court's findings of fact only for clear error, and give due weight to the inferences the trial court drew from those facts. Id. "When an appeal is directed at a trial court's findings of fact, the reviewing court must determine only whether the findings were against the manifest weight of the evidence."State v. Bokesch, 11th Dist. No. 2001-P-0026, 2002-Ohio-2118, at ¶ 12. "Judgments supported by some competent, credible evidence going to all the essential elements * * * will not be reversed by a reviewing court *Page 5 
as being against the manifest weight of the evidence." State v.Schulte (Oct. 25, 1996), 11th Dist. No. 94-L-186, 1996 Ohio App. LEXIS 4675, at *24 (citation omitted).
 {¶ 11} Once the trial court's factual determinations are accepted, the appellate court then conducts a de novo review of the trial court's application of the law to those facts. Dohner, 2004-Ohio-7242, at ¶ 10.
 {¶ 12} In denying Cheadle's suppression motion, the trial court made the following relevant findings of fact:
 {¶ 13} "Defendant lived in a college dormitory at Kent State with a roommate, who is the alleged victim in this case. While the victim was taking a shower, Defendant used a mirror to try to spy on him. When the victim said something, Defendant left the shower area. The Kent State University Police Department was contacted to investigate the incident.
 {¶ 14} "Officer Futo from that department spoke with the alleged victim and then knocked on Defendant's door. The defendant answered the door and the officer asked if he could speak with him. Defendant then allowed the officer to come into his room and sit on the couch to discuss the incident."
 {¶ 15} Cheadle raises three arguments in support of his assignment of error. First, he argues that "[e]vidence taken from appellant was derivative of an illegal entry and should have been suppressed as fruit of the poisonous tree." Specifically, Cheadle argues that the "evidence," in the form of his written and oral confessions, and the detergent bottle, in which the mirror was allegedly hidden, were obtained as the result of Officer Futo's violation of hisFourth Amendment right to privacy in his dormitory room. Next, Cheadle asserts that the "[incriminating statements and written confession taken *Page 6 
from [a]ppellant were involuntary and derivative of an unconstitutional custodial interrogation and should have been suppressed from the evidence." Finally, he asserts that "[t]he tangible items taken from [a]ppellant were derivative of an unlawful interrogation and or detention in violation of Section 10, Article I of the Ohio Constitution and should have been suppressed from the evidence." Since these arguments are interrelated, they will be addressed together.
 {¶ 16} The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."
 {¶ 17} "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v.United States Dist. Court (1972), 407 U.S. 297, 313. For this reason "searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York (1980) 445 U.S. 573, 586. TheFourth Amendment protection against unreasonable searches and seizures extends to college dormitory rooms in the same manner it extends to private homes. State v. Ellis, 2nd Dist. No. 05CA78, 2006-Ohio-1588, at ¶ 13, citing Athens v. Wolf (1974), 38 Ohio St.2d 237, at paragraph one of the syllabus.
 {¶ 18} However, unless a person is searched or seized at the time the police "approache[s] and questions] him, the Fourth Amendment is not implicated." State v. Phipps, 11th Dist. No. 2006-P-0098,2007-Ohio-3842, at ¶ 15 (citation omitted).
 {¶ 19} A "search" is defined, for Fourth Amendment purposes as "an intrusion into a[n] * * * area" in which a "reasonable expectation of privacy" exists. State v. *Page 7 Wilcoxson (July 25, 1997), 2nd Dist. No. 15928, 1997 Ohio App. LEXIS 3566, at *12-*13 (citations omitted).
 {¶ 20} Both parties rely on case law dealing with the circumstances under which an individual may validly consent to the search of a private residence. It is well-settled that, under the Fourth Amendment, "a search conducted pursuant to a valid consent is constitutionally permissible." Schnekloth v. Bustamonte (1973), 412 U.S. 218, 222
(citations omitted); see also Willoughby v. Cicek (Mar. 18, 1994), 11th Dist. No. 92-L-203, 1994 Ohio App. LEXIS 1145, at *6 ("A warrantless entry into a home to conduct a search or arrest is unreasonable under the Fourth Amendment in the absence of consent.").
 {¶ 21} "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of the search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Schneckloth,412 U.S. at 222 (citation omitted). "To rely on the consent exception to the warrant requirement, the state must show by `clear and positive' evidence that consent was `freely and voluntarily' given." State v. Posey (1988),40 Ohio St.3d 420, 427 (citation omitted). "[T]he question of whether a consent to a search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth,412 U.S. at 227.
 {¶ 22} "There is a distinction between consent to enter into aresidence and consent to a search of the residence." Akron v.Harris (1994), 93 Ohio App.3d 378, 381-382, citing State v. Pamer
(1990), 70 Ohio App.3d 540, 542-543 (emphasis added). Where the intent of officers is "not to search, but to question a resident," a *Page 8 
"reasonableness standard" applies. State v. Chapman (1994),97 Ohio App.3d 687, 690.
 {¶ 23} A review of the suppression hearing transcript reveals that the trial court's factual findings with regard to Officer Futo's initial entry was supported by competent, credible evidence. Although there were factual disagreements between the testimony of Cheadle and Officer Futo, with regard to whether Officer Futo knocked on the closed door of Cheadle's room and announced his presence prior to being let in, or whether Cheadle was standing in the open doorway and subsequently allowed Officer Futo to enter into the room through the open door, these disagreements are ultimately insignificant since, under either scenario, Cheadle allowed Officer Futo to enter the room.
 {¶ 24} It is well-settled that a trial court in assessing witness credibility "is free to believe all, part, or none of the testimony of each witness appearing before it." Warren v. Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at *8 (citations omitted). In the present case, the trial court was more inclined to believe Officer Futo's version of events. A review of Cheadle's own testimony indicates that he was made aware by his Resident Advisor, prior to Officer Futo's arrival, that a police officer would be arriving to question him about the incident. Under the circumstances, the trial court's finding that defendant voluntarily consented to Officer Futo's entry was not against the manifest weight of the evidence and we are bound to accept it.
 {¶ 25} Cheadle argues that the trial court erred by explicitly failing to rule on the issue of whether his Fourth Amendment rights were violated by Officer Futo's subsequent entries into his room during the course of the investigation. We disagree. *Page 9 
 {¶ 26} Officer Futo testified that, after initially questioning Cheadle, he left the room "a few times" to confer with the victim, to "clarify" the stories and resolve discrepancies before returning to Cheadle's room to speak with him further. Cheadle testified that Officer Futo briefly left his room to speak with the victim a second time, in order to attempt to resolve discrepancies in the two stories, returned shortly thereafter to Cheadle's room to question him further, and subsequently left and re-entered the room to retrieve his typed confession.
 {¶ 27} Cheadle argues that his Fourth Amendment rights were violated since he did not give his express permission for Officer Futo to re-enter. This argument ignores the well-settled axiom that "consent to enter can be expressed or implied." State v. Schroeder (Oct. 26, 2001), 6th Dist. No. WD-00-076, 2001 Ohio App. LEXIS 4786, at *7 (citation omitted); accord State v. Asworth (Apr. 11, 1991), 10th Dist. No. 90AP-916, 1991 Ohio App. LEXIS 1623, at *13. Moreover, it has been held that "[t]he standard for measuring the `scope' of a suspect's consent under the Fourth Amendment is that of `objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" State v. Lane, 2nd Dist. No. 21501, 2006-Ohio-6830, at ¶ 43 (citation omitted).
 {¶ 28} Since the undisputed evidence makes clear that Officer Futo's subsequent entries into Cheadle's room were the result of an ongoing investigation into a single incident, we find it objectively reasonable for Cheadle to expect that Officer Futo would be re-entering his room without specifically requesting permission for each separate entry. Absent some affirmative evidence of Cheadle attempting to exclude Officer Futo's subsequent entries, we conclude that the trial court did not err by failing to *Page 10 
analyze each subsequent "entry" into Cheadle's room for the purpose of finding Fourth Amendment violations. Cf. State v. Townsend, 11th Dist. No. 98-L-036, 1999 Ohio App. LEXIS 3986, at *12, (in which this court held that the officer's "re-entry into appellant's home" violated appellant's Fourth Amendment rights, since it "was done for the purpose of further investigating appellant's intoxication and possible driving" and not for the burglary of his home, which was the crime the officer was initially summoned to investigate).
 {¶ 29} Cheadle next argues that oral and written confessions, as well as the detergent bottle allegedly containing the mirror, were the result of "a direct exploitation of [his] Fourth Amendment rights" and thus, should have been excluded as "fruit of the poisonous tree." Cheadle further argues that the aforementioned evidence should have been suppressed, since it was obtained in violation of his Fifth Amendment right against self-incrimination. We find no merit to these arguments.
 {¶ 30} As an initial matter, we note that "[n]ot every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment. Phipps, 2007-Ohio-3842 at ¶ 16, citing United States v. Barry (C.A.8 2005), 394 F.3d 1070, 1074. It is well-settled that "[t]he Fourth Amendment cannot be invoked unless the person has been `seized.'" State v. Welz (Dec. 4, 1994), 11th Dist. No. 93-L-137, 1994 Ohio App. LEXIS 5528, at *4.
 {¶ 31} In order for a seizure to have been deemed to have taken place under the Fourth Amendment, "the person's liberty must have beenrestrained by physical force or show of authority." State v. Grant (July 14, 1989), 11th Dist. No. 1362, 1989 Ohio App. LEXIS 2807, at *7 (emphasis sic), citing State v. Maurer (1984), 15 Ohio St.3d 239, 255. *Page 11 
In other words, "if the officer `by either physical force or show of authority restrains the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter,' then the constitutional guarantees [of theFourth Amendment] are implicated." State v. Harris, 2nd Dist. No. 19479, 2003-Ohio-2519, at ¶ 11 (citation omitted). "The police can be said to have seized an individual `only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" State v. Jones (1990), 70 Ohio App.3d 554, 557, citing United States v. Mendenhall (1980), 446 U.S. 544, 554. "The test is an objective one and is designed to assess the coercive effect of police conduct, taken as a whole, rather than focus on particular details of that conduct in isolation." Id., citing Michigan v.Chesternut (1988), 486 U.S. 567, 573.
 {¶ 32} "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, or the use of language or a tone of voice indicating that the suspect was not free to leave the officer's presence." Id.
 {¶ 33} The ?`exclusionary rule' * * * `commands that where evidence has been obtained in violation of the search and seizure protections guaranteed by the U.S. Constitution, the illegally obtained evidence cannot be used at the trial of the defendant.'" Hilliard v.Elfrink, 77 Ohio St.3d 155, 158, 1996-Ohio-333 (citation omitted). "The exclusionary rule bars not only the admission of primary evidence which was obtained as a direct result of a constitutional violation, but also prohibits the introduction of subsequent evidence gleaned as anindirect result of the constitutionally violative conduct. Such secondary evidence is often referred to as derivative evidence, *Page 12 
or `fruit of the poisonous tree.'" State v. Harden (May 26, 2000), 11th Dist. No. 98-L-234, 2000 Ohio App. LEXIS 2274, at *12.
 {¶ 34} The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled * * * to be a witness against himself." In order to protect this right, the United States Supreme Court, in Miranda v. Arizona 384 U.S. 436, 444, held that the prosecution may not use statements stemming from custodial interrogation, unless it demonstrates that procedural safeguards were taken to secure the defendant's privilege against self-incrimination. Among these safeguards are the Miranda warning, the right to end questioning at any time until an attorney is obtained, and an intelligent, knowing and voluntary waiver of this privilege. Id. However, "coercive police activity is a necessary predicate to finding that a confession is not voluntary within the Fifth Amendment on whichMiranda was based." State v. Hopfer (1996), 112 Ohio App.3d 521, 547
(citation omitted). In contrast to the Fourth Amendment exclusionary rule, "the Miranda rule protects against violations of theFifth Amendment Self-Incrimination Clause," i.e. it applies to statements made by the defendant, "but does not apply to nontestimonial physical evidence." State v. Farris, 109 Oho St.3d 519, 2006-Ohio-3255, at ¶ 37, citing United States v. Patane (2004), 504 U.S. 630, 637-639.
 {¶ 35} Similar to the rule governing Fourth amendment seizures, the safeguards prescribed by Miranda are not applicable until such time as a suspect's freedom of action is curtailed to a "degree associated withformal arrest." Berkemer v. McCarty (1984), 468 U.S. 420, 440 (citation omitted) (emphasis added). Cf. State v. Davis (Jan. 31, 1994), 12th Dist. No. CA93-06-007, 1994 Ohio App. LEXIS 324, at *6 ("[A] seizure is *Page 13 
an arrest rather than a Terry detention if the reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.") (citation omitted).
 {¶ 36} In Ohio, courts have held that the existence of an arrest is dependent on the following four factors: "(1) An intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." State v. Barker (1978),53 Ohio St.2d 135, 139 (citation omitted).
 {¶ 37} Cheadle is correct in noting that "the `inherently coercive' atmosphere of a custodial interrogation can occur even if a suspect is questioned in his home." Sylvania v. Cellura (Mar. 31, 1998), 6th Dist. No. L-97-1086, 1998 Ohio App. LEXIS 1218, at *16 (citations omitted). Though we agree with this general proposition, this does not obviate the requirement that the suspect's belief that he "had no choice but to cooperate" must be "objectively reasonable." Hopfer,112 Ohio App.3d at 546. "The mere presence of police officers," without more, "does not render a suspect powerless, particularly * * * within the familiar surroundings of [his] own home." Id. Under an "objectively reasonable" standard, "both the subjective intent of the [officer] as well as the subjective belief of the suspect are irrelevant." Cellura, 1998 Ohio App. LEXIS 1218, at *16 (citation omitted). In order to determine whether a person was in custody for purposes of providingMiranda warnings, "the court should apply a totality of the circumstances test, including where the interrogation occurred, whether the investigation had focused on the subject, whether the objective indicia of arrest were present, and the length of *Page 14 
the questioning involved." State v. Scott (2001), 146 Ohio App.3d 233,238, citing Stansbury v. California (1994), 511 U.S. 318, 321.
 {¶ 38} In the case sub judice, the court made the following relevant findings of fact:
 {¶ 39} "Defendant was not in custody and no Miranda rights were issued. Defendant then admitted to spying on alleged victim for sexual gratification. He agreed to make a written statement and was allowed to use his computer to do so. He then retrieved a detergent bottle and a mirror which was taken into evidence by the officer."
 {¶ 40} As this court has stated, "[w]hether there was a show of authority sufficient to communicate to a reasonable person that he was not free to leave is a factual determination for the trial court to make." Welz, 1994 Ohio App. LEXIS 5528, at *5, citing Florida v.Bostick (1991), 501 U.S. 429, 437.
 {¶ 41} Our review of the record reveals there was competent credible evidence to support the trial court's conclusion. Officer Futo testified that, after arriving alone at approximately 3:00 p.m., he initially went to speak with the victim. After getting the victim's account of the incident, he knocked on Cheadle's door and announced his presence. Cheadle allowed Futo into his dormitory room, where he sat on the couch and conversed with Cheadle. Cheadle had been alerted by his Resident Advisor that a member of the campus police department was coming to investigate the incident.
 {¶ 42} Futo described the initial conversation as "pretty low key," in which he "basically asked [Cheadle] what had happened earlier in the day." Officer Futo testified that Cheadle was never restrained or placed under arrest, either during or immediately after the encounter; that he was free to move about his room; that he used his own *Page 15 
computer to write out his statement, since no statement form was available; that he responded to additional questions in writing; and that the entire encounter took 20 to 25 minutes from start to finish.
 {¶ 43} Officer Futo further testified as follows:
 {¶ 44} "He had told me his story, what had happened. It conflicted with the victim's story, but since I had just heard the victim's story * * *, I went back and spoke to the victim to clarify, you know, he's saying this and that conflicts with what you're saying, and they would kind of set me straight on what happened and so on. I'd go back and talk with them. * * * Then on one of the last times [I spoke with each party to the incident] it just didn't seem like the stories were lining up."
 {¶ 45} "I changed the tone my tone of voice (sic) a little bit with them, directed my questions a little bit more, and basically told them that I was going to leave there today and either way, whether they wanted to tell me the truth or not, * * * the officers, detectives would be investigating the case further and that it wasn't just going to end there, and that seemed to change [Cheadle's] decision to tell me the truth of what happened."
 {¶ 46} "He told me what happened, which involved a mirror. He went and got the mirror for me which he said he had put in a detergent [bottle] to hide it, and I said okay. I then asked him if I could have it, and he said sure. He talked about opening it up and getting the mirror and go[ing] through this detergent but it just didn't seem suitable. He said I could dump it out, but I said no, that's okay."
 {¶ 47} "I then asked him if he could write out a statement about what he had told me. He was going to but then he asked if he could type it out on his computer. I said *Page 16 
that was fine. He went to his room, typed it up on his computer and I went and spoke with the victim a little bit more during that time, came back, [and] clarified some questions."
 {¶ 48} "I believe at that time also he showed me his camera * * *. This victim was concerned that [Cheadle] had taken pictures of him. He had dropped his camera and broke it, so we couldn't really review it. But like I said, [I] clarified a few questions on his statement and then I left."
 {¶ 49} Cheadle's testimony differed in that he stated the conversation lasted approximately forty minutes, and that he was threatened with arrest for "lying to a police officer" if he didn't tell the truth about the incident. However, as mentioned before, "the trial court [has] the discretion to resolve the conflicts in testimony; to the extent that the trial court's judgment is supported by the evidence, it may not be reversed." Groveport v. Sexton (June 7, 1994), 10th Dist. No. 93APC10-1468, 1994 Ohio App. LEXIS 2472, at *6. Given Officer Futo's testimony, the court's findings of fact were supported by competent, credible evidence.
 {¶ 50} As a final matter, Cheadle cites to the Ohio Supreme Court's decision in Farris for the proposition that "Section 10, Article I of the Ohio Constitution may offer broader protection to its citizens beyond that which is required under the U.S. Constitution," and thus, extend constitutional protections as the result of pre-Miranda statements to physical evidence obtained as the result of these statements. 2006-Ohio-3255, at ¶ 48. While true as a general proposition, the Farris court held that these protections only apply insofar as such evidence was "obtained as the direct result of statements made in custody without the benefit of a Miranda warning." Id. at ¶ 49 *Page 17 
(emphasis added). Since the trial court's decision correctly concluded that Cheadle was not in custody based upon the evidence, Section 10, Article I of the Ohio Constitution was not violated.
 {¶ 51} Based upon the foregoing, Cheadle's sole assigned error is without merit. Accordingly, the judgment of the Portage County Municipal Court, Kent Division, denying Cheadle's Motion to Suppress, is affirmed. Costs to be taxed against appellant.
 CYNTHIA WESTCOTT RICE, J., TIMOTHY P. CANNON, J., concur. *Page 1