**[Cite as *State v. Perez*, 2025-Ohio-509.]**

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-P-0015 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| TIMOTHY J. PEREZ, | |
| Defendant-Appellant. | Trial Court No. 2023 CR 00521 |

**O P I N I O N**

Decided: February 18, 2025
Judgment: Affirmed

---

*Connie J. Lewandowski*, Portage County Prosecutor, *Pamela J. Holder* and *Kristina K. Reilly*, Assistant Prosecutors, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Eric J. Cherry*, N.P. Weiss Law, 3091 Mayfield Road, Suite 320, Cleveland Heights, OH 44118 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Timothy Perez, appeals the judgment of conviction from the Portage County Court of Common Pleas after a jury trial. Appellant was found guilty of three counts of Rape, first-degree felonies in violation of R.C. 2907.02 and one count of Gross Sexual Imposition, a third-degree felony in violation of R.C. 2907.05. Appellant has raised four assignments of error arguing that his Fifth Amendment right against self-incrimination was violated; that his confession was involuntary; that the trial court erred by failing to declare a mistrial after the State prejudiced the jury; and that trial counsel rendered ineffective assistance of counsel.

{¶2} Having reviewed the record and the applicable caselaw, we find Appellant's assignments of error to be without merit. First, the objective circumstances of Appellant's interview with Detective Svab demonstrate that it was not a custodial interrogation and that his confession was voluntary. Second, none of the State's conduct rose to the level that Appellant did not receive a fair trial, and the trial court did not err in failing to sua sponte order a mistrial based on the State's comments. Finally, trial counsel's failure to file a motion to suppress or call certain witnesses did not fall below an objective standard of reasonable representation, and had counsel done so, there is not a reasonable probability the outcome of the trial would have been different.

{¶3} Therefore, the judgment of the Portage County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶4} On May 11, 2023, Appellant was charged through a secret indictment with three counts of Rape, first-degree felonies in violation of R.C. 2907.02; three counts of Sexual Battery, second-degree felonies in violation of R.C. 2907.03; and one count of Gross Sexual Imposition, a third-degree felony in violation of R.C. 2907.05. Appellant pled not guilty to the charges.

{¶5} On August 21, 2023, the State filed a supplemental indictment charging Appellant with three additional counts of Gross Sexual Imposition in violation of R.C. 2907.05. Appellant pled not guilty to these additional charges.

{¶6} Next, on October 17, 2023, the State filed an amended indictment that amended the charges to three counts of Rape and one count of Gross Sexual Imposition.

{¶7} On January 9, 2024, a jury trial began.

2

{¶8} At the trial, Savanah Watson testified that she is the mother of "MK" (DOB 10-20-2019). She said that she had known Appellant since 2017, but the two began a relationship in 2021, and he moved into her residence shortly thereafter. Watson said that Appellant had lost his apartment and needed to move in with her. She said that he did not work or assist with the rent. She said he was "able bodied" and "just didn't want to" work. Watson said that she worked during the day and Appellant watched MK. Appellant was the father of Watson's youngest child, born in 2022, but was not the biological father of MK.

{¶9} Watson said that while she was pregnant, she noticed that MK began throwing fits and refused to stay with Appellant and cried to the point of throwing up whenever she was around him. Watson said that MK would hide behind her when Appellant tried to be with her. Because of this, she began sending MK to Watson's grandmother for care. Watson also noted other unusual behaviors from MK, such as saying that she had seen a man in dark clothes in her bedroom. After her youngest child was born, Watson also noticed that MK began to touch the child's genitals.

{¶10} Watson and Appellant moved to a new residence in November 2022. Watson said that MK was scared to sleep alone and referenced the man in black clothes more often. MK also began obscuring the eyes of her dolls and writing sad faces on the walls in what Watson described as doing "anything to show that she's not okay." MK also became curious about the family dog's genitals and began trying to touch them.

{¶11} Watson said that she confronted Appellant about potential abuse because of MK's actions. Appellant denied any wrongdoing. Watson moved out of her apartment in January 2023 and broke off contact with Appellant. She said that MK's anxiety abated

3

after this. At this time, MK also pointed on a baby doll to indicate that she had been touched on her genitals. Watson contacted Child Protective Services (CPS) and the police to report Appellant's suspected conduct.

{¶12} The State introduced several photographs of MK at the age of three, during the timeframe of the alleged criminal conduct. Appellant's trial counsel stipulated to the pictures being published to the jury and did not object to their admission.

{¶13} Jessica Hoskin, a nurse interviewer with the Children's Advocacy Center, testified about the evaluation she performed of MK in February 2023. Hoskin said that MK's young age made the forensic interview difficult. She said that MK did not disclose any sexual abuse during the interview and denied that anyone had every touched her "private parts." After the interview, Hoskin conducted a non-invasive physical examination and did not find any apparent signs of abuse. Hoskin said that the lack of specific disclosure, denial of disclosure, and lack of physical signs of abuse is not unusual and does not exclude the possibility of abuse, particularly with very young children.

{¶14} Marcia Watson, MK's great-grandmother, testified as to her observations about Appellant and MK. She said that MK was initially very fond of Appellant, but that after several months she noticed a change in behavior. She said that MK began to hide from Appellant and throw fits when Appellant would pick MK up from her house.

{¶15} Dr. Paul McPherson, Division Director for the Children at Risk Evaluation Clinic with Akron Children's Hospital, testified. Dr. McPherson said that according to at least one study, 75% of children delay reporting their sexual abuse for over a year after it happened. He also said that 90-95% of sexual abuse cases result in a normal physical exam with no physical manifestations of abuse. This can be because the abuse did not

4

result in injury or that the injury healed by the time of an examination. Dr. McPherson said that, despite the lack of MK disclosing abuse and the lack of physical evidence of abuse, he believed that MK's reported behavioral changes were consistent with sexual abuse.

{¶16} Detective Dustin Svab, of the Ravenna Police Department, testified about his investigation arising from the allegations against Appellant. Based on the reported conduct and the medical evaluation report, Detective Svab contacted Appellant to discuss the allegations.

{¶17} Appellant scheduled the interview and voluntarily appeared at the Ravenna Police Department on May 5, 2023. The State played a 38-minute audio recording of that interview for the jury. The interview took place in the administrative area of the department which is used as a conference room or lunchroom. Although the doors to the room were shut, Detective Svab told Appellant that the doors did not lock, and Appellant was seated closest to the door. He said that Appellant could leave at any time and did not have to talk to him. Detective Svab said that regardless of what Appellant said, Appellant would walk out of there today but offered that "where we go from here, I don't know."

{¶18} Appellant said that he gets Social Security Disability because he has bipolar disorder and oppositional defiance disorder and has difficulty working with people and taking direction. Detective Svab testified that Appellant otherwise seemed able-bodied.

{¶19} During the interview Detective Svab said that they were there to discuss the allegations surrounding MK. He explained that he had conducted other interviews like this one and said that there are consequences for the choices people make. He said that whenever something "however slight" may have happened, the police want to investigate.

5

Case No. 2024-P-0015

{¶20} Detective Svab said that he believed there were a couple of incidents that were "minor in nature." He said that he believed that Appellant had touched MK. Appellant acknowledged that he would change MK's diapers and had touched her, but he said he did not do so in a sexual manner. Detective Svab said that he was not talking about those kinds of contacts. He said maybe a situation started out as a diaper change but that due to curiosity turned into something more. Appellant denied this characterization. Detective Svab said no one was accusing Appellant of having sex with MK but said that he believed there was inappropriate touching. He again asked Appellant if curiosity got the best of him.

{¶21} Appellant said that "mentally, I might have accidentally did something. Not to hurt her or anything else, but like you said, curiosity might have got the best of me one time." Detective Svab asked for additional information and stressed that he had a medical report with information that Appellant's story needed to mesh with.

{¶22} Appellant said that "curiosity killed the cat" and, after back and forth with Detective Svab, admitted that he touched MK's genitals with his fingers. Appellant also agreed with Detective Svab's characterization that he penetrated her genitals "ever so slightly." He said that this happened, at most, three times. Appellant also agreed with Detective Svab's characterization that he had coached or encouraged MK to place her hand on his genitals over his clothing.

{¶23} During Detective Svab's testimony, the State asked him to identify MK from her picture in State's Exhibit 1. Appellant objected to showing MK's picture again, but the trial court overruled the objection. Detective Svab answered a brief question about MK's

6

date of birth and said the picture reflected her age and development at the time of the alleged offense.

{¶24} The State rested and submitted its exhibits. Appellant's trial counsel did not object to any of the pictures of MK but did observe that the pictures "were kind of duplicate. We've got so many photos. . . . But I don't seen any harm in it." Appellant made a Crim.R. 29 motion, which the trial court denied.

{¶25} The jury found Appellant guilty on all counts with the additional finding that the victim was under 10 at the time of the offense.

{¶26} On March 1, 2024, the trial court sentenced Appellant to three terms of life in prison with eligibility for parole after 15 years on each of the Rape counts to be served concurrently and five years in prison for the Gross Sexual Imposition count to run concurrently to the other counts.

{¶27} Appellant timely appealed raising four assignments of error.

**Assignments of Error and Analysis**

{¶28} Appellant's first assignment of error states: "The Court failed to protect Appellant's 5th Amendment [sic] against self-incrimination."

{¶29} Appellants second assignment of error states: "Appellant's confession was involuntary as it was obtained by way of psychological manipulation."

{¶30} In his first and second assignments of error, Appellant suggests that law enforcement officers have learned how to comply with the tenants of the Fifth Amendment's right against self-incrimination and thus have learned how to tactically avoid those requirements. He believes that despite the hallmarks of an appropriate non-custodial interrogation, the interrogating officer's continued dissatisfaction with his

7

statements and encouragement to confess was the proverbial "lock on the door" rendering his interrogation custodial. He states that his "voluntary" interview with Detective Svab was not truly voluntary and that his apparent options during the interview were either to leave the interview without a confession, ensuring that he would appear guilty, or to confess. This Hobson's choice left him with no option but to confess and made the confession involuntary. Appellant seeks for this Court to expand the *Miranda* warnings rule to apply in situations where law enforcement has identified a suspect regardless of whether an interrogation is custodial or non-custodial.

{¶31} Because Appellant did not raise this issue below, "under the circumstances of this case, appellant has forfeited all but plain error on review." *State v. Carnes*, 2015-Ohio-4429, ¶ 8 (11th Dist.). "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The appellant bears the burden of demonstrating plain error by proving that the outcome would have been different absent the plain error. *State v. Payne*, 2007-Ohio-4642, ¶ 17. The plain error must be a deviation from a legal rule and an obvious defect in the proceedings. *Rogers* at ¶ 22.

{¶32} Further, even when the error is obvious, "it must have affected substantial rights," meaning "'that the trial court's error must have affected the outcome of the trial.'" *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). This is the same deferential standard applied for "reviewing ineffective assistance of counsel claims." *Id.* Indeed, "even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it . . . ." *Id.* at ¶ 23. Courts

8

are cautioned "to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at 27, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶33} Given the factual setting of Appellant's confession, there are two discrete issues we must determine: first, whether he was subjected to a custodial interrogation, which would trigger the requirements for law enforcement officers to advise him of his so-called *Miranda* rights against self-incrimination; and second, regardless of whether Appellant was subjected to custodial interrogation, whether Appellant's confession was voluntary.

**Custodial interrogation**

{¶34} In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution." *Cleveland v. Oles*, 2017-Ohio-5834, ¶ 8. Those rights guaranteed by the Fifth Amendment apply with equal force to the States by virtue of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *see also* Ohio Const., art. I, § 10.

{¶35} However, "[t]he procedural safeguards identified in *Miranda* apply only when one is subjected to custodial interrogation." *State v. Hoffner*, 2004-Ohio-3430, ¶ 26. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Oles* at ¶ 9, quoting *Miranda* at 444.

{¶36} "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

9

Case No. 2024-P-0015

demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* at 444. "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Lather*, 2006-Ohio-4477, ¶ 6, quoting *Miranda* at 479.

{¶37} "Any statement, question or remark which is 'reasonably likely to elicit an incriminating response' is an interrogation." *State v. Knuckles*, 65 Ohio St.3d 494, 495 (1992), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

{¶38} To determine whether an individual is in custody, and thus afforded the procedural safeguards outlined in *Miranda*, a court must consider "the circumstances surrounding the interrogation" and whether, under those circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "A determination of whether an interrogation is custodial or non-custodial depends on the objective circumstances of the interrogation, not the subjective views held by either the officer or the person being questioned." *State v. Guzzi*, 2015-Ohio-4426, ¶ 18 (11th Dist.), citing *Stansbury v. California*, 511 U.S. 318, 323 (1994).

10

{¶39} Looking at the totality of the circumstances, courts apply several factors as instructive to determine whether an interview is custodial including: "'where the interrogation occurred, whether the investigation had focused on the subject, whether the objective indicia of arrest were present, and the length of the questioning involved.'" *State v. Cheadle*, 2008-Ohio-2393, ¶ 37 (11th Dist.), quoting *State v. Scott*, 146 Ohio App.3d 233, 238 (5th Dist. 2001), citing *Stansbury* at 321. Other factors to consider include the use of physical restraints, statements made during the interview, and whether the interviewee was released following questioning. *Howes v. Fields*, 565 U.S. 499, 509 (2012).

{¶40} The interviewee's freedom of movement is not, alone, determinative. *Id.* Instead, courts should ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. 'Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.'" *Id.* quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010).

{¶41} In this case, the record established at trial objectively demonstrates that Appellant was not in custody during his interview. Appellant scheduled the time of the interview and voluntarily appeared at the Ravenna Police Department. The 38-minute interview did not take place in an interrogation room or a holding cell but rather was conducted in a department common area used as a conference room or lunchroom. The doors to that room were shut, but Appellant was told that the doors did not lock and was seated closest to the doors. He was told that he was free to leave at any time and did not have to talk to Detective Svab. Detective Svab further told Appellant that no matter what

11

he said, he would leave the interview but did caution Appellant that there might be consequences for what he said. At the end of the interview, Appellant was told he was free to go, and he left the police department. These factors all support the conclusion that Appellant was not in custody during his interview and therefore was not entitled to the procedural safeguards as provided in *Miranda*. Appellant's request for an expansion of *Miranda* to include non-custodial interrogations of suspects is not well-taken.

**Voluntariness of confession**

{¶42} Separate from the issue of compliance with *Miranda* in custodial interrogations is the voluntariness of the defendant's confession. *In re N.J.M.,* 2010-Ohio-5526, ¶ 18 (12th Dist.), citing *State v. Chase*, 55 Ohio St.2d 237, 246 (1978). Due process concerns require the exclusion of confessions that are obtained involuntarily. *Dickerson v. United States*, 530 U.S. 428, 434 (2000). To satisfy due process in reference to a confession, the government must prove by a preponderance of the evidence that the confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

{¶43} A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . ." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). A court reviews the totality of the circumstances surrounding the confession including the "'characteristics of the accused and the details of the interrogation'" to determine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson* at 434, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "[A]dmonitions to tell the truth directed at a suspect by police officers are not coercive in nature." *State v. Wiles*, 59 Ohio St.3d 71, 81 (1991). "Promises that a defendant's cooperation would be considered in the disposition of the case, or that

12

Case No. 2024-P-0015

a confession would be helpful, does not invalidate an otherwise legal confession." *State v. Loza*, 71 Ohio St.3d 61, 67 (1994).

**{¶44}** The record established at trial demonstrates that Appellant's confession was voluntary. Detective Svab did not badger or berate Appellant. He was calm, cordial, and friendly. Many of the same factors that rendered the interview non-custodial also demonstrate the voluntariness of the confession. Further, Appellant's personal characteristics suggest that his confession was voluntary. Appellant said that he has oppositional defiance disorder, which makes taking direction from others difficult for him. Although Detective Svab did suggest what Appellant's conduct might have been, Appellant fully embraced these descriptions and agreed that he had gone too far and that curiosity killed the cat. Appellant's self-described diagnosis would suggest that he was not prone to simply agree with others in order to appease them, and nothing suggests he did so here.

**{¶45}** Accordingly, Appellant's first and second assignments of error are without merit.

**{¶46}** Appellant's third assignment of error states: "The Court erred by failing to declare a mistrial after the State prejudiced the jury against Appellant."

**{¶47}** In his third assignment of error, Appellant argues that the trial court should have declared a mistrial due to prosecutorial misconduct. He says the misconduct manifested itself through the State's portrayal of him as "being a lazy good-for-nothing" in an attempt to make the jury dislike him. He also argues that the State improperly relied on "cute" pictures of MK to play on the sympathies of the jury.

13

{¶48} Appellant's trial counsel did not seek a mistrial. Further, Appellant's trial counsel did not object to the State's characterization of Appellant as lazy. Finally, although trial counsel objected to using a picture of MK during Detective Svab's testimony, counsel did not object to the admission of her pictures and did not object to any other use during the trial. Appellant has waived all but plain error in reference to our review of whether the trial court should have declared a mistrial.

{¶49} "A trial court is entitled to broad discretion in considering a motion for a mistrial, and our standard of review is whether the trial court abused its discretion." *State v. Rosebrook*, 2017-Ohio-9261, ¶ 9 (11th Dist.). "The decision to grant a mistrial 'is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice.'" *Id.*, quoting *State v. Bigsby*, 2013-Ohio-5641, ¶ 58 (7th Dist.). "A mistrial will only be granted when the substantial rights of a party are adversely affected." *Id.*

{¶50} In a claim of prosecutorial misconduct, whether based on improper remarks or other conduct, we consider (1) whether the State's remarks or conduct were improper, and if so, (2) whether they prejudicially affected the appellant's substantial rights. *State v. Treesh*, 2001-Ohio-4, ¶ 22. The allegedly improper statements or conduct are evaluated in the context of the entire trial. *Id.* Improprieties do "not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without" them. *Id.*

{¶51} None of the State's conduct rose to the level that Appellant did not receive a fair trial, and the trial court did not err in failing to sua sponte order a mistrial based on the State's comments. The State's characterization of Appellant was not gratuitous and

14

served to establish that MK's mother was working long hours and that either Appellant or MK's great-grandmother cared for MK during the day. The testimony also established the urgency of Savannah Watson's decision to remove herself from Appellant after she suspected that he was abusing MK. Despite Watson paying the rent and utilities, Watson immediately moved out to get MK away from him. In addition to this, Appellant's interview with Detective Svab contains statements from Appellant that he was not working. The State's questions about whether Appellant worked or paid bills were probative and were not substantially outweighed by the danger of unfairly prejudicing the jury about Appellant's character. *See* Evid. R. 403(A).

{¶52} The State's reliance on the use of MK's pictures during the trial may be characterized as cumulative, particularly as presented by Detective Svab. *See* Evid.R. 403(B). However, the determination to admit or exclude evidence lies within the discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Glavic*, 2024-Ohio-209, ¶ 44 (11th Dist.). We cannot say that the trial court abused its discretion by overruling Appellant's objection to the use of MK's picture during Detective Svab's testimony. To be sure, it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the additional use of MK's picture and the State's use of the picture during Detective Svab's testimony was brief.

{¶53} Accordingly, Appellant's third assignment of error is without merit.

{¶54} Appellant's fourth assignment of error states: "The Court erred by denying Appellant effective assistance of counsel."

{¶55} In his final assignment of error, Appellant argues that trial counsel was ineffective for failing to file a motion to suppress the admission of Appellant's interview

15

Case No. 2024-P-0015

with Detective Svab. He also asserts that counsel was ineffective by failing to call Appellant's family members as witnesses to impeach the credibility of the State's witnesses' characterization of him as lazy and could have called a co-worker of Savannah Watson's to testify that she did not work the long hours she said she did during trial. Appellant maintains that this evidence may have undermined Savanah Watson's credibility and led to his acquittal.

{¶56} In reviewing an ineffective assistance of counsel claim, the standard we apply is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Story*, 2007-Ohio-4959, ¶ 49 (11th Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984). An appellant must demonstrate (1) counsel was deficient in some aspect of representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different. *Strickland* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A failure to "satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶57} An appellant "'must show that the attorney made errors so serious that he or she was not functioning as "counsel" as guaranteed by the Sixth Amendment, and . . . that he or she was prejudiced by the deficient performance.'" *Story* at ¶ 49, quoting *State v. Batich*, 2007-Ohio-2305, ¶ 42 (11th Dist.). Ohio courts presume that every properly licensed attorney is competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). "Counsel's performance will not be deemed

16

ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995). "'Failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial.'" *State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.), quoting *State v. Shannon*, 1982 WL 5057, *2 (9th Dist. June 16, 1982).

{¶58} "'Failure to file a suppression motion does not constitute per se ineffective assistance of counsel.'" *Madrigal* at 389, quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "'When claiming ineffective assistance due to failure to file or pursue a motion to suppress, an appellant must point to evidence in the record showing there was a reasonable probability the result of [the proceeding] would have differed if the motion had been filed or pursued.'" *State v. Walker*, 2010-Ohio-4695, ¶ 15 (11th Dist.), quoting *State v. Gaines*, 2007-Ohio-1375, ¶ 17 (11th Dist.). "'If case law indicates the motion would not have been granted, then counsel cannot be considered ineffective for failing to prosecute it.'" *Id.*, quoting *Gaines* at ¶ 17.

{¶59} In this case, we cannot say that trial counsel's performance fell below and objective standard of reasonable representation. As discussed above in reference to the first and second assignments of error, the trial record does not support the conclusion that a motion to suppress would have been successful in excluding Appellant's taped confession from trial.

17

{¶60} Appellant's contention that trial counsel should have called certain individuals to testify on his behalf presumes facts that are not in the record. We cannot assume that family members or Savanah Watson's coworkers would have testified as described in Appellant's brief. Because the record does not contain any evidence to suggest that additional witnesses could or would have so testified, trial counsel's failure to call such witnesses amounts to a matter of trial tactics. We will not second guess debatable trial tactics when determining whether trial counsel rendered ineffective assistance of counsel.

{¶61} Appellant has failed to demonstrate that trial counsel's performance fell below an objective standard of reasonable representation and that the outcome of his proceeding would have been different.

{¶62} Accordingly, Appellant's fourth assignment of error is without merit.

{¶63} For the foregoing reasons, the judgment of the Portage County Court of common Pleas is affirmed.

MATT LYNCH, J.,

EUGENE A. LUCCI, J.,

concur.

18

Case No. 2024-P-0015